**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Terry LANIER, Samuel Stevens, Carl Jamerson, Defendants–Appellants.**

**No. 89–8836.**

United States Court of Appeals,
Eleventh Circuit.

Jan. 10, 1991.

G. Terry Jackson, Savannah, Ga., for T. Lanier.

Orion L. Douglass, Brunswick, Ga., for S. Stevens.

Harvey Weitz, Weiner, Ginsberg, Shearouse & Weitz, Savannah, Ga., for C. Jamerson.

Arthur W. Leach, Asst. U.S. Atty., Savannah, Ga., Merve Hamberg, Joseph Douglas Wilson, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before EDMONDSON and COX, Circuit Judges, and WISDOM *, Senior Circuit Judge.

* Honorable John Minor Wisdom, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

WISDOM, Senior Circuit Judge:

A jury convicted Stevens Oil Company ("Stevens Oil"), two of its officers, Samuel Stevens and Terry Lanier, and Carl Jamerson, a government employee, for their respective parts in a scheme that defrauded the federal government of millions of dollars over a three year period beginning in 1982. Defendants, Stevens, Lanier, and Jamerson, appeal their convictions. They raise ten points of error that they argue require reversal of various aspects of their respective convictions.

We have reviewed all of the points raised by the defendants, and find none of them warrants reversal. We affirm their convictions.

## I. FACTUAL BACKGROUND

In 1981, the Small Business Administration ("SBA"), under the authority of section 8(a) of the Small Business Act,[1] subcontracted to Stevens Oil the task of supplying fuel oil to the Defense Fuel Supply Center ("DFSC").[2] The subcontract required Stevens Oil to deliver fuel oil to various military installations in the area of Savannah, Georgia, including Fort Stewart and Hunter Army Air Field.[3] The subcontract lasted one year and was renewed by the parties for three additional one year terms beginning in 1982.

In November 1984, spot checks by the government revealed that Stevens Oil had charged the government for two large fuel deliveries that had never been made.[4] Further investigation revealed substantial evidence of a conspiracy among officials at Stevens Oil, including defendant Stevens, the president of Stevens Oil, and defendant Lanier, the office manager, and certain government officials, including defendant Jamerson,[5] to bill the government for fuel oil that was never actually delivered.

Based on this evidence, the government indicted the defendants alleging that defendants conspired to steal government property and to defraud the United States, in violation of 18 U.S.C. § 371; that they conspired to defraud the United States by obtaining payment of false claims, in violation of 18 U.S.C. § 286; that they stole government property, in violation of 18 U.S.C. § 641; and that they presented a false claim to a government agency, in violation of 18 U.S.C. § 287. In addition, the indictment alleged that Stevens Oil, Stevens, and Lanier had bribed a government official, in violation of 18 U.S.C. § 201(b)(1)(B) and that Jamerson had accepted a bribe, in violation of 18 U.S.C. § 201(b)(2)(B).

At trial, numerous witnesses testified to the roles of defendants Stevens, Lanier, and Jamerson in the conspiracy, to the payment of bribes to both Jamerson and Charles Riggs,[6] and to numerous specific incidences of bills submitted to the DFSC for fuel oil that was never delivered.[7] Because the defendants do not question the sufficiency of the evidence relating to their convictions for the submission of false bills, we shall not detail the evidence relating to the false billing conspiracy.

---

1. Under this section of the Act, the SBA contracts to supply goods or services to other federal agencies. The SBA then finds a qualified business and subcontracts the task to the qualified business. 15 U.S.C.A. § 637(a) (West Supp. 1990).

2. IV R. 277. Citations to the record will be in the form: volume R. p.

3. IV R. 179.

4. The tickets submitted by Stevens Oil indicated two fuel deliveries, each of approximately eight thousand gallons of fuel, one on November 21, 1984 and one on November 27, 1984. V R. 699, 744. However, daily records of the fuel level in the tank during that period showed that no delivery had occurred, V R. 744, 761–62; indeed, the records made clear that the addition of 8,000 gallons on either day would have caused the tank to overflow. V R. 744–45, 764–65.

5. Mr. Jamerson was a civilian employee of the government responsible for verifying fuel deliveries at Hunter Army Air Field. VI R. 1188.

6. Mr. Riggs, a civilian employee responsible for verifying fuel deliveries at Fort Stewart, testified under a grant of immunity. VI R. 1078.

7. Fifteen Stevens Oil employees, former employees, or subcontractors testified concerning the nature and extent of the conspiracy and the various methods used to defraud the government.

In addition to the conspiracy to submit and the actual submission of false claims, during the 1984 subcontract (which ran from April 1, 1984 to March 31, 1985), the SBA made advance payments under 13 C.F.R. § 124.401 [8] of $3 million to Stevens Oil.[9] Stevens Oil has failed to repay $1.8 million of this advance.[10] Because defendants Lanier and Stevens question the sufficiency of the evidence to support their convictions under 18 U.S.C. § 641 for embezzling these funds, it is necessary to detail the evidence relating to the advance payment.

The advance payment was essentially an interest free loan made to the subcontractor, Stevens Oil, by the general contractor, the SBA, to provide the capital necessary for Stevens Oil to fulfill its duties under the section 8(a) subcontract.[11]

> Stevens Oil could use the advance only: for the purchase of materials, payment of labor, payment for equipment expenses, general and administrative expenses and overhead, and payments to the subcontractors of the 8(a) concern necessary for the performance of the specific 8(a) subcontract for which the advance payments were authorized.[12]

The SBA placed the money in a special bank account at Carver State Bank ("the joint account"). Use or withdrawal of the funds by Stevens Oil required the counter-signature of an SBA official.[13] The SBA would approve the withdrawal or use of the funds only after Stevens Oil submitted a check request and supporting documents, such as supplier invoices, tying the expenses to the 1984 subcontract.[14] After review and approval of the expenses by the SBA, the checks would be issued.

The contract between the SBA and Stevens Oil required Stevens Oil to notify the DFSC that all payments under the 1984 subcontract were to be sent directly to the joint account.[15] Once in the joint account, the funds would be under the supervision of the SBA and could be used only to pay Stevens Oil's expenses under the 1984 subcontract (and to repay the advance).[16]

However, on its invoices to the DFSC, Stevens Oil indicated that the DFSC should pay Stevens Oil directly, and made no mention of the joint account.[17] As a result of the invoices, the DFSC paid Stevens Oil directly.[18]

When Stevens Oil received the first payments from the DFSC, Stevens directed Lanier not to deposit the check directly into the joint account.[19] Rather, Stevens told Lanier to wait and see if the SBA noticed the error.[20] When the SBA failed to notice the error, Stevens Oil deposited the checks into other accounts,[21] and then used the funds to pay off expenses unrelated to the section 8(a) subcontract.[22]

---

**8.** The advance payment program is not specifically provided for by the Small Business Act, nor has it been authorized by Congressional funding of the program as it is not a budget item. VII R. 1361. Presumably, the SBA can create the advance payment program under the broad mandate given administrative agencies by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). But we note that the SBA essentially loaned Stevens Oil $3 million under the SBA's program despite the fact that under the actual loan program authorized by Congress, loans to any one concern are capped at $1.25 million. 15 U.S.C.A. § 636(a)(3) (West Supp.1990).

**9.** VI R. 1128.

**10.** VI R. 1135; VII R. 1398.

**11.** 13 C.F.R. § 124.401(a)(3).

**12.** 13 C.F.R. § 124.401(e)(1); *see also* VII R. 1365.

**13.** 13 C.F.R. § 124.401(e)(3).

**14.** 13 C.F.R. § 124.401(e)(3)(ii).

**15.** 13 C.F.R. § 124.401(d)(4); *see also* VII R. 1366.

**16.** 13 C.F.R. § 124.401(e)(3)(i); *see also* VI R. 1128–29.

**17.** VII R. 1367.

**18.** VI R. 1239; VII R. 1367.

**19.** VI R. 1239.

**20.** VI R. 1239.

**21.** VI R. 1239–40.

**22.** VI R. 1239; VII R. 1340.

To conceal the fact that the DFSC payments were not being made directly into the joint account, Stevens Oil wrote checks, from time to time, on these other accounts and deposited the checks into the joint account.[23] Stevens Oil then provided supporting paperwork to the SBA suggesting that the checks represented the full payments received from the DFSC under the subcontract.[24]

Over the course of the 1984 subcontract, the DFSC paid Stevens Oil $8.4 million for fuel oil deliveries.[25] Yet, Stevens Oil represented to the SBA that Stevens Oil had invoiced the DFSC for only $7.2 million in deliveries.[26] Furthermore, Stevens Oil deposited only $5.2 million into the joint account, and represented to the SBA that the DFSC had not paid the remainder of the invoiced amounts.[27]

Thus, over the course of the 1984 subcontract, Stevens Oil misdirected $3.2 million of the proceeds from the 1984 subcontract and used a large part of these funds to pay off debts and expenses unrelated to the subcontract.[28] As a result, Stevens Oil was unable to repay $1.8 million of the money advanced to it by the SBA.

For their respective parts in the false billing scheme, the jury convicted Stevens, Lanier, and Jamerson of one count of conspiracy to steal government property and to defraud the United States, in violation of 18 U.S.C. § 371; one count of conspiracy to defraud the United States by obtaining payment of false claims, in violation of 18 U.S.C. § 286; two counts of theft of government property, in violation of 18 U.S.C. § 641; and two counts of presenting a false claim to a government agency, in violation of 18 U.S.C. § 287. The jury convicted Stevens and Lanier on an additional count of theft of government property relating to the $1.8 million of the advance payment that was not repaid, and on two counts of bribing a public official to commit a fraud, in violation of 18 U.S.C. § 201(b)(1)(B). The jury convicted Jamerson on one count of accepting an illegal gratuity in return for committing a fraud against the government, in violation of 18 U.S.C. § 201(b)(2)(B).

The trial judge entered judgment on the jury's verdict and sentenced defendant Stevens to an aggregate term of ten years in prison,[29] defendant Lanier to an aggregate term of seven years in prison,[30] and defendant Jamerson to an aggregate term of 15 years in prison.[31] The trial judge also fined defendant Stevens $500,000,[32] and defendant Jamerson $100,000.[33]

## II. DISCUSSION OF THE ISSUES

The defendants have raised numerous points on appeal, but we find that only two of them merit discussion: (1) whether the Double Jeopardy Clause permits, and Congress intended to permit, the conviction and sentencing of defendants for violations of both the general conspiracy statute, 18 U.S.C. § 371, and a specific conspiracy statute, 18 U.S.C. § 286, when the evidence established only one conspiracy, and (2) whether the evidence presented is sufficient to sustain the jury's finding that defendants Lanier and Stevens embezzled $1.8 million of the advance payment that Stevens Oil has failed to repay.

A. *Conviction of Defendants Under Both 18 U.S.C. § 371 and 18 U.S.C. § 286*

██ The defendants argue that the trial judge improperly submitted two conspiracy

---

23. VII R. 1369–74, 1381–83.

24. VII R. 1339–40, 1370–74.

25. VII R. 1388–89. The total sales under the subcontract fell below the original estimate of $14 million in sales for two reasons: (1) the DFSC placed smaller orders than was originally expected and (2) the DFSC terminated the subcontract with Stevens Oil in late 1984 for reasons unrelated to the fraudulent activity. VII R. 1284.

26. VII R. 1382.

27. VII R. 1381–82.

28. VII R. 1339–40.

29. III R. 105.

30. III R. 107.

31. III R. 108.

32. III R. 105.

33. III R. 108.

counts to the jury when the evidence established only one agreement with multiple purposes. They contend, citing *United States v. Mori* [34] and *United States v. Corral,* [35] that participants in a single conspiracy cannot be convicted under both the general conspiracy statute and a specific conspiracy statute.

Indeed, in both *Mori* and *Corral,* the Fifth Circuit held that participants in a single conspiracy could not be convicted under both a specific and the general conspiracy statute.[36] Subsequent to the decisions in *Mori* and *Corral,* however, the Court in *Albernaz v. United States* [37] upheld a dual conviction of the defendants under two specific conspiracy statutes, even though the evidence established only one conspiracy.[38]

While *Albernaz* involved convictions under two specific conspiracy statutes, we find that the analysis used by the Court in *Albernaz* requires us to reach a result contrary to that reached in *Corral* and *Mori.* We begin our analysis of the Double Jeopardy issue by comparing the two conspiracy statutes the defendants were convicted of violating.

The wording of the two statutes makes their substantial overlap immediately apparent.[39] Both statutes prohibit agreements to defraud the government. Their wording, however, also makes clear several differences in the statutes. Section 286 is narrower; it applies only when the conspirators agree to defraud the government in a specific manner: "by obtaining the payment or allowance of any false, fictitious, or fraudulent claim." [40] Section 371, on the other hand, reaches agreements to defraud the government without regard to the particular means chosen by the conspirators to carry out their agreement.[41]

Perhaps because the submission of false bills is particularly difficult to detect and, therefore, more likely to succeed, Congress has provided a longer maximum prison term under section 286 (ten years), than it has under section 371 (five years).

A further difference is that, under section 371, the government must establish an overt act—that one of the conspirators has taken some concrete action in furtherance of the conspiracy.[42] Consistent with the Court's admonition in *Singer v. United States,* [43] we hold that section 286 does not require the government to establish an overt act.[44]

**34.** 444 F.2d 240 (5th Cir.), *cert. denied,* 404 U.S. 913, 92 S.Ct. 238, 30 L.Ed.2d 187 (1971).

**35.** 578 F.2d 570 (5th Cir.1978).

**36.** 578 F.2d at 572; 444 F.2d at 245.

**37.** 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981).

**38.** 450 U.S. at 336–37, 101 S.Ct. at 1140–41.

**39.** Section 371 provides:
If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both. 18 U.S.C.A. § 371 (West 1966).
Section 286 provides:
Whoever enters into any agreement, combination, or conspiracy to defraud the United States, or any department or agency thereof, by obtaining or aiding to obtain the payment or allowance of any false, fictitious, or fraud-

ulent claim, shall be fined not more than $10,000 or imprisoned not more than ten years, or both. 18 U.S.C.A. § 286 (West 1969).

**40.** 18 U.S.C.A. § 286 (West 1969).

**41.** By its own terms, the statute prohibits agreements to defraud the United States "... in any manner or for any purpose ...". 18 U.S.C.A. § 371 (West 1969).

**42.** *See, e.g., United States v. Hirsch,* 100 U.S. (10 Otto) 33, 34, 25 L.Ed. 539 (1879); *United States v. Perkins,* 748 F.2d 1519, 1527 (11th Cir.1984); *United States v. Wieschenberg,* 604 F.2d 326, 331 (5th Cir.1979).

**43.** In the absence of statutory language requiring proof of an overt act, government need not establish overt act. 323 U.S. 338, 340, 65 S.Ct. 282, 283–84, 89 L.Ed. 285 (1945).

**44.** The trial court erroneously instructed the jury that an overt act was an essential element of the § 286 conspiracy count. VIII R. 1911. At oral argument, counsel for the defendants argued that, because the government failed to

In resolving the Double Jeopardy claim, we note that Congress could have provided, but did not, a fifteen year maximum term under section 286. Instead, Congress created two slightly different statutory sections, one with a five year term, the other with a ten year term. This separation creates two risks addressed by the Double Jeopardy Clause.

The first risk is the risk of successive prosecutions for essentially the same offense. Given the minimal differences in the two statutes, the government could try a defendant first under section 286 and then under section 371. Such consecutive prosecutions would give the government two chances to find a jury that agrees with the government's view of the evidence, the sort of behavior the Double Jeopardy clause prohibits.[45]

The second risk is that a jury presented with two charges might compromise in a close case, convicting the defendant under one of the two conspiracy statutes, but not the other; possibly, had the jury considered only one count, it might have found the evidence insufficient to establish guilt. When presented with two counts, the jury might split the difference and convict on one of the two counts, *on the same evidence.* The possibility of compromise presents a serious risk that the jury might convict on one of the counts even though not convinced of the defendant's guilt beyond a reasonable doubt.

This case, like *Albernaz,* involved neither consecutive trials nor a compromise verdict. Rather the government presented both counts to a single jury and the jury convicted the defendants of violating both conspiracy statutes. In this situation, because Congress could have provided a fif-

teen year term to begin with, *Albernaz* indicates that our sole inquiry must focus on whether Congress intended to permit prosecution under both statutes for the same conspiracy. Essentially, we must decide whether Congress intended the general conspiracy statute as a lesser included offense of the specific conspiracy statute, or intended the two statutes to address two different crimes, when applied to a single conspiracy.

According to the Court in *Albernaz,* we look to the elements required to establish a violation of each statute.[46] If each conspiracy statute requires an element not required by the other, then we should presume that Congress intended the two statutes to address two different crimes, even though there is only one conspiracy.[47]

While the two statutes do overlap substantially, each statute calls for an element not required by the other. Section 371 requires proof of an overt act taken by one of the conspirators in furtherance of the conspiracy. Section 286 requires proof that the conspirators agreed to defraud the government through a particular device: obtaining payment of a false claim. Thus, each statute requires proof of an element not required by the other.

Given that an overt act need not be criminal, and may indeed be otherwise innocent,[48] we acknowledge that those cases in which the government will have sufficient evidence to establish the conspiracy but insufficient evidence to establish an overt act are far more likely to reside in the realm of imagination than in the real world in which defendants are prosecuted.

Given this reality, Congress may not have intended for courts to distinguish the

---

object to the elements charged at trial, the government cannot now argue that § 286 does not require an overt act. We reject this contention. The failure of the government to object to an erroneous instruction, that was more favorable to the defendant, cannot create a Double Jeopardy violation where there would not otherwise be one.

**45.** *See, e.g., North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076–77, 23 L.Ed.2d 656 (1969).

**46.** 450 U.S. at 337, 101 S.Ct. at 1141 (citing the test enunciated in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932)).

**47.** 450 U.S. at 337, 101 S.Ct. at 1141.

**48.** *See, e.g., United States v. Donner,* 497 F.2d 184, 192 (7th Cir.) (constitutionally protected speech may constitute the necessary overt act), *cert. denied,* 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 641 (1974).

general conspiracy statute from specific conspiracy statutes based upon the overt act element alone. Nevertheless, the *Albernaz* Court has directed us to look for differences in the statutory elements, not for differences of practical significance, in determining whether Congress intended to create a second, separate crime rather than a lesser included offense.[49] Our consistent application of this rule provides a framework for communication between Congress and the courts.[50] The consistency of the framework permits Congress to draft and revise legislation with a fair certainty of how the courts will interpret it. Here, a consistent application requires that we assume that Congress by drafting differing elements into the two statutes intended to create two separate crimes.

This rule of construction, however, creates only a presumption.[51] Other evidence of Congressional intent, if sufficiently probative, can rebut this presumption.[52] Therefore, we look for other indications of how Congress intended these two statutes to interact.

In 1948, Congress passed a comprehensive revision of title 18. In dealing with the various conspiracy statutes, Congress deleted a large number of the specific conspiracy statutes, because the specific conspiracies addressed in those statutes were adequately covered by section 371.[53] Congress, however, retained some of the specific conspiracy statutes, including section 286.

The Reviser's Notes to section 371 indicate that Congress retained section 286 because "the punishment provided in [section 371] would not be commensurate with the offense" of conspiring to defraud the government by submitting false claims.[54]

In *Nakashian*, a panel of the Second Circuit found this language to suggest that Congress intended to permit punishment under both a specific and the general conspiracy statute.[55] We are not convinced. We read the Reviser's words to mean that the punishment provided by the specific conspiracy statute would be more appropriate than would be the lesser punishment provided by the general statute, not that punishment under both would be appropriate.

*Nakashian* also relied on the existence of two separate statutory sections to support its holding that Congress intended to create two separate crimes in enacting both the general and a specific conspiracy statute.[56] Again, we are unconvinced. As the Court noted in *Albernaz*, the existence of two statutory sections "raise[s], rather than resolve[s]",[57] the question of whether Congress intended punishment under both statutes for a single conspiracy.

■ While the words used by the Reviser provide some indication that Congress did not intend to create two separate crimes for a single conspiracy by retaining section 286, we do not find the words sufficiently unambiguous to provide the "clear indication of contrary legislative intent" [58]

---

**49.** *Albernaz*, 450 U.S. at 337, 101 S.Ct. at 1141; see also *United States v. Nakashian*, 820 F.2d 549, 553 (2d Cir.), *cert. denied*, 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 392 (1987).

**50.** We note that the Court has retained the *Blockburger* test despite opportunities to replace it. *See, e.g., Gore v. United States*, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958).

**51.** 450 U.S. at 340, 101 S.Ct. at 1142–43.

**52.** *Id.*

**53.** *See* H.R.Rep. No. 304, 80th Cong., 1st Sess. A11 (1948), *quoted* in 18 U.S.C.A. § 371 Reviser's Note (1969).

**54.** The Reviser's Note actually states that the specific conspiracy statutes were retained only

"(1) where the conspiracy would constitute the only offense, or (2) where the punishment provided in this section would not be commensurate with the offense." *See* H.R.Rep. No. 304, 80th Cong., 1st Sess. A11 (1948), *quoted* in 18 U.S.C.A. § 371 Reviser's Note (1969). Given that § 287 punishes the submission of false invoices, 18 U.S.C.A. § 287 (West 1969), the first reason given in the Reviser's Notes does not apply.

**55.** 820 F.2d at 553.

**56.** *Id.*

**57.** 450 U.S. at 336–37, 101 S.Ct. at 1141.

**58.** 450 U.S. at 340, 101 S.Ct. at 1143.

necessary to rebut the *Albernaz* presumption. Therefore, we hold that Congress intended to permit punishment under both section 371 and section 286 for a single conspiracy.

■ In our result, we concur with the other circuits that have addressed this issue and hold that a defendant may properly be prosecuted under the general conspiracy statute and a specific conspiracy statute so long as each statute requires proof of an element not required by the other.[59]

B. *Sufficiency of the Evidence that Defendants Intended to Steal or Convert the $1.8 million of the Advance that Was Never Repaid*

Defendants Stevens and Lanier argue that the government presented insufficient evidence to support their convictions under 18 U.S.C. § 641.[60] First, they argue that the government presented no evidence that the defendants possessed the requisite criminal intent with regard to the $1.8 million. Second, they argue that the evidence did not establish that the $1.8 million was the property of the United States within the meaning of 18 U.S.C. § 641.

■ In reviewing the sufficiency of the evidence to support the defendants' convictions, we evaluate the evidence in the light most favorable to the government and determine whether any reasonable jury could find that the evidence established the requisite elements beyond a reasonable doubt.[61]

■ In discussing the evidence relating to the defendants' criminal intent, we note that they were tried simultaneously for their submission of false invoices to the DFSC and for embezzling the $1.8 million. We recognize that the extensive evidence introduced concerning the criminal intent of the defendants in submitting the false claims may have caused the jury to ascribe improperly to defendants a similar intent with regard to the $1.8 million. Nevertheless, we find more than enough evidence indicating defendants' intentions concerning the $1.8 million to uphold the conviction.

In this circuit, to establish the requisite criminal intent, the government need only prove that defendants knowingly used government property for their own purposes in a manner that deprived the government of the use of the property.[62] Defendants' intention to repay the $1.8 million, even actual repayment, is not a defense to a charge of embezzlement under section 641, so long as the money was the property of the United States when it was taken.[63]

In looking at the evidence, we note that the funds withdrawn from the joint account, although floated through defendants' own interest bearing accounts, were

---

**59.** *United States v. Marren*, 890 F.2d 924, 936–37 (7th Cir.1989); *Nakashian*, 820 F.2d at 553; *Timberlake v. United States*, 767 F.2d 1479, 1481–82 (10th Cir.1985), *cert. denied*, 474 U.S. 1101, 106 S.Ct. 882, 88 L.Ed.2d 918 (1986); *United States v. Barton*, 647 F.2d 224, 234–36 (2d Cir.), *cert. denied*, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981).

**60.** In pertinent part, 18 U.S.C. § 641 provides:
   Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys, or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof....
   Shall be fined not more than $10,000 or imprisoned not more than ten years, or both;
   ....
   18 U.S.C. § 641 (1982).

**61.** *See, e.g., United States v. Roper*, 874 F.2d 782, 787 (11th Cir.1989).

**62.** The cases refer to three elements: (1) that the property belonged to the government, (2) that the defendant fraudulently used the property for his own purposes or the purposes of another, and (3) that the defendant did so knowingly and willfully with the intent either temporarily or permanently to deprive the government of the property. *See, e.g., United States v. Burton*, 871 F.2d 1566, 1570 (11th Cir.1989) (per curiam); *United States v. Bailey*, 734 F.2d 296, 303 (11th Cir.), *cert. denied*, 469 U.S. 931, 105 S.Ct. 327, 83 L.Ed.2d 263 (1984).

**63.** *See Bailey*, 734 F.2d at 303–306 (disagreeing with *United States v. Collins*, 464 F.2d 1163 (9th Cir.1972), *United States v. Evans*, 572 F.2d 455 (5th Cir.), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978), and *United States v. Forcellati*, 610 F.2d 25 (1st Cir.1979), *cert. denied*, 445 U.S. 944, 100 S.Ct. 1342, 63 L.Ed.2d 778 (1980)).

properly used by Stevens Oil to cover its expenses under the 1984 subcontract.[64] Because the float did not deprive the government of its intended use of the funds, which was to pay those expenses,[65] we focus on the failure of the defendants to deposit the payments received under the subcontract into the joint account as evidence of the defendants' intent.

Both the subcontract between Stevens Oil and the SBA, and the regulations governing advance payments, require that payments under the section 8(a) subcontract be made directly into the joint account. Once in the joint account, the funds were to be used exclusively to pay expenses under the 1984 section 8(a) subcontract and to repay the $3 million advance.

Instead, Stevens Oil, with the active participation of both Stevens and Lanier, deposited the payments into other accounts. Of the $8.4 million that Stevens Oil received under the 1984 subcontract, only $5.2 million was deposited in the joint account.

The defendants used the difference, $3.2 million, to operate other businesses and to pay off debts unrelated to the 1984 subcontract. Being spent, the SBA could not use these funds to repay the $1.8 million owed to it by Stevens Oil at the end of the 1984 subcontract.

Based on this evidence, a jury could reasonably find that the defendants knowingly used these funds for their own purposes in a manner that deprived the government of the use of the funds. Thus, we reject defendants' first argument that the evidence was insufficient to establish the requisite criminal intent.

█ The defendants also argue that the evidence did not support the jury's finding that the payments under the subcontract were the property of the United States. To

evaluate the jury's finding, we look at "the basic philosophy of ownership reflected in the relevant statutes and regulations." [66] And we look to "the supervision and control contemplated and manifested on the part of the government" [67] over the payments as a key factor in determining ownership.

The evidence indicating close control and supervision by the SBA over the money earned and spent by Stevens Oil under the 1984 section 8(a) subcontract is extensive. First, we note that the DFSC originally contracted with the SBA concerning the fuel deliveries. Under its authority under section 8(a), the SBA subcontracted this task to Stevens Oil. Thus, under the statute and regulations, Stevens Oil was the subcontractor of the SBA.

Second, under federal regulations and under the subcontract between the SBA and Stevens Oil, all of the funds relating to the subcontract were to be kept in the joint account. The payments by the DFSC were to be made directly to the joint account, and the payments of expenses incurred by Stevens Oil under the subcontract were to be made directly from the joint account. To use the funds in the joint account, Stevens Oil had to inform the SBA of which contractor was to be paid, how much, and why, and support its request with invoices or other documents. All payments from the joint account required the signature of an SBA officer. Furthermore, the SBA could withdraw money from the joint account without the approval of Stevens Oil.[68] In fact, the only way Stevens Oil could retain any of the funds from the subcontract without the approval of the SBA was simply to lie concerning the amount of payment received under the subcontract.

In short, the statutes and regulations governing the relationship between Stevens Oil, the SBA, and the section 8(a) subcontract create a comprehensive scheme of

---

**64.** VII R. 1337.

**65.** We note that the Special Bank Account was not an interest-bearing account. 13 C.F.R. § 124.401(c)(2) (1990). Thus, defendants did not even deprive the government of any interest the government might have earned on the money.

**66.** *United States v. Evans,* 572 F.2d at 472 (citing *United States v. Farrell,* 418 F.Supp. 308 (M.D. Pa.1976)).

**67.** *Evans,* 572 F.2d at 472.

**68.** VI R. 1130.

government control and supervision of the funds relating to the 1984 subcontract. To obtain independent control over the funds, Stevens Oil had to make misrepresentations concerning the funds.

We hold that this evidence was sufficient to support the jury's finding that the payments received by Stevens Oil under the 1984 subcontract were the property of the United States within the meaning of section 641.[69]

## III. CONCLUSION

We hold that the overt act required by section 371 sufficiently distinguishes a violation of section 371 from a violation of section 286 to permit punishment under both statutes for a single conspiracy. We also hold that there was sufficient evidence to sustain the defendants' convictions under section 641.

We have reviewed the defendants' other contentions and find that none of them merits reversal. We AFFIRM the convictions of the defendants.

---

**69.** We find support for our conclusion in several cases that have found money placed in private hands for a federal purpose with federal supervision to qualify as property of the United States within the meaning of 18 U.S.C. § 641. *See United States v. Hope,* 901 F.2d 1013, 1018–20 (11th Cir.1989) (per curiam); *United States v.*

*McIntosh,* 655 F.2d 80, 83–84 (5th Cir. Unit A Sept. 1981), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1450, 71 L.Ed.2d 662 (1982).

