**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**C. Arthur McINTOSH,
Defendant-Appellant.**

No. 80–3793.

United States Court of Appeals,
Fifth Circuit.
Unit A

Sept. 4, 1981.

Rehearing and Rehearing En Banc Denied
Oct. 6, 1981.

Grady F. Tollison, Jr., Oxford, Miss., for defendant-appellant.

H. M. Ray, U. S. Atty., Alfred E. Moreton, Asst. U. S. Atty., Oxford, Miss., for plaintiff-appellee.

Before CHARLES CLARK, TATE and SAM D. JOHNSON, Circuit Judges.

CHARLES CLARK, Circuit Judge.

C. Arthur McIntosh, a Cleveland, Mississippi attorney, appeals his judgment of conviction for making false statements to the Farmers Home Administration (FmHA) in violation of 18 U.S.C. section 1001. McIntosh argues that the Government failed to prove his false statement was "material" as required by section 1001. He also contends that he was prejudiced by the district court's refusal to dismiss or sever six counts of the indictment which charged him with embezzling government funds. We find adequate proof of materiality and no error in the trial court's refusal to dismiss or sever. Accordingly, we affirm McIntosh's conviction.

I.

At his request, the FmHA approved McIntosh as a loan closing attorney. The terms of this approval required McIntosh to maintain his own professional liability insurance and a fidelity bond payable to the FmHA, to maintain a bank escrow account into which all funds received would be deposited, to close loans in accordance with FmHA instructions, and to furnish the FmHA promptly after each loan closing a properly completed loan closing statement form.[1]

In February 1979, approximately one year after McIntosh was approved as a loan closing attorney, the FmHA made an emergency loan to consolidate the farming debts of W. T. Tullos. The FmHA sent its check

---

1. The "Agreement to Provide Loan Closing Services" took the form of a request from McIntosh with an approval by FmHA officials. It provided in pertinent part:

I request your designation as an approved loan closing attorney ... If my request is approved, I agree:

   \*    \*    \*    \*    \*    \*

To maintain Lawyer's Professional liability insurance in the amount of at least $100,000.

   \*    \*    \*    \*    \*    \*

To maintain for any period in which I am such escrow agent and have custody or control of FmHA funds, funds of lenders insured by FmHA, or FmHA applicants' funds (all of which will be hereinafter referred to as FmHA funds) a fidelity-type bond to insure against fraudulent or dishonest act or acts and to provide such bond to FmHA. Also, to maintain for each employee or staff associate having access to the FmHA funds a fidelity bond to cover any fraudulent or dishonest acts and to provide a copy of such bond to FmHA. Such bond or bonds will be in the amount of at least $10,000.

To maintain a fidelity bond on each of my employees or agents having access to the escrow funds for closing FmHA loans in the amount of at least $40,000 for each employee or agent.

   \*    \*    \*    \*    \*    \*

To close these transactions in accordance with FmHA Instruction 427.1 and any other specific instructions issued to me by the State Director, County Supervisor, or other authorized official of FmHA or by any attorney or official of the Office of the General Counsel of the United States Department of Agriculture.

To maintain a bank account as an escrow account for the FmHA funds and to deposit in such account all such funds received by me.

To disburse such funds in accordance with instructions sent to me by the Farmers Home Administration.

   \*    \*    \*    \*    \*    \*

To furnish FmHA promptly after each loan closing Form FmHA 427–17, "Loan Closing Statement," properly completed and executed.

in the amount of the loan, payable to Tullos and his wife, to McIntosh, who had been selected by Tullos as the closing attorney for his loan. The check was accompanied by written loan closing instructions to McIntosh which specified how the loan proceeds were to be disbursed. McIntosh obtained the endorsement in blank of Tullos and his wife on the check, then endorsed it himself "for deposit to FmHA Escrow Acct." and deposited it in a bank account listed as the "C. Arthur McIntosh FmHA Escrow Account." This procedure was in accordance with the FmHA's standard instructions. These instructions also required McIntosh to prepare and file a loan closing statement with FmHA detailing how the loan proceeds had been handled. The instructions applicable to the Tullos loan required McIntosh to pay various listed debts of Tullos, and authorized McIntosh to pay himself a fee of $1,000.

In March 1979, McIntosh submitted the required loan closing statement to the FmHA stating that all creditors had been paid according to the terms of the loan agreement. This was false. McIntosh made several unauthorized payments to himself and used the escrow funds to pay his own debts. Some of Tullos' creditors were not paid until August 1979, when McIntosh was able to return funds he "borrowed" from the escrow account. On the closing statement McIntosh listed his fee as $2,000 instead of the $1,000 authorized in FmHA's instructions. Tullos, who was hospitalized immediately after the loan check was received from the FmHA, was unaware of McIntosh's improper use of the escrow funds. At trial Tullos testified that, to the extent the escrow funds belonged to him, he had no objections to the way in which McIntosh used them.

McIntosh was charged with one count of making a false statement to the government under 18 U.S.C. section 1001, and with six counts of embezzling government property under 18 U.S.C. section 641. McIntosh moved to dismiss or sever the section 641 counts on the ground that the money in the escrow account belonged to Tullos, and not to the government. The trial court denied this motion. The jury acquitted McIntosh on all section 641 counts, but found him guilty of making a false statement under section 1001.

## II.

Section 1001 prohibits false statements to the government about a "material fact". McIntosh concedes that his loan closing statement to the FmHA was false. He argues, however, that if the district court made a finding of materiality it did so under an improper legal standard, or, if the issue was put to the jury, the court's charge to the jury was inaccurate. He also contends that the government failed to produce any evidence of materiality because no proof showed that the FmHA ever read or relied on the statement.

Materiality is a matter of law for the trial court to decide. *United States v. Winkle*, 587 F.2d 705, 713 (5th Cir. 1979). The record reveals that the district court made an explicit finding of materiality both in denying McIntosh's motion for judgment of acquittal [2] and in its charge to the jury.[3] However, the trial judge also instructed the jury that "to constitute concealment of a material fact ... it is not necessary that the agent relied or acted to a detriment, but the government must show that the concealment had the capacity to deceive the federal agency". McIntosh contends that this latter part of the charge not only submitted materiality to the jury, but also did so under an improper "capacity to deceive" standard used by the court. McIntosh asserts that testing for "capacity to deceive" or "tendency to deceive" properly determines whether a false statement was filed

2. "[T]he execution and filing of this loan statement with FHA does have a tendency to deceive the government agency as to what did happen with the money."

3. "Whether or not loan funds have been disbursed in accordance with Farmers Home Administration's instructions is a fact material to the proper functioning of the [FmHA] loan program."

with specific intent to violate section 1001. He contends that the only proper test for materiality is whether the false statement had a "tendency to influence" agency action.

Assuming *arguendo* that the second quoted statement from the trial court's charge was designed to commit the materiality issue to the jury, we fail to perceive any resulting harm to McIntosh. The court's initial charge told the jury as a matter of law that a loan closing statement was material to the proper functioning of the FmHA. This instruction supplied the element of influence which McIntosh asserts section 1001 requires. The only facts which remained for the jury to find were that McIntosh made such a statement, and that the statement was false. Moreover, the "capacity to deceive" instruction abridged no element of the statutory crime. While our decisions do state the test as "tendency" or "capacity to influence," [4] it would make words the master of ideas to limit the concept of materiality to this phrase. In the context of this case the charge given reasonably includes both the concepts of agency deception and influence on an agency decision.

█ McIntosh also argues that evidence of materiality was lacking because there was no showing that an FmHA employee would ever read, or base any decision on, the statement McIntosh submitted. Here again the defendant has focused too narrowly. Our cases make clear that a statement may be material even though the Government does not actually rely on it. *See e. g., United States v. Lichenstein,* 610 F.2d 1272, 1278 (5th Cir. 1980). It is enough that "the potential for subversion of an agency's functioning [can] readily be inferred." *United States v. Beer,* 518 F.2d 168, 172 (5th Cir. 1975). The Government introduced testimony of the purposes of the FmHA program, including the fact that the specific loan agreement to Tullos called for mandatory payments to named creditors. It is readily inferable from this testimony that a statement falsely indicating that the required payments had been made subverted the agency's functions. Had McIntosh's loan closing statement promptly and truthfully revealed the fact that the loan proceeds entrusted to him had been used, not to liquidate Tullos' farming debts, but to pay his own debts, the FmHA could have acted to protect its program from such subversion. It avails McIntosh nothing to contend that his false statements indicating the closing was routine were ignored by the FmHA, or that the government failed to prove they provoked examination. The issue more aptly is whether disclosure of the truth could have provoked the agency to action. The trial judge correctly ruled that McIntosh's statement was material in the meaning of section 1001.

### III.

McIntosh's second argument is that his ability to defend the section 1001 count was prejudiced by the presence of six counts of embezzling public property under 18 U.S.C. section 641. The jury acquitted McIntosh of all six embezzlement counts. Nevertheless, he argues that the existence of the six counts prejudiced his case in the eyes of the jury and foreclosed strategic options. According to McIntosh, the trial court should have eliminated the prejudice by dismissing or severing the section 641 counts. In McIntosh's view, the money in the escrow fund had been disbursed to Tullos, and thus was not "money ... of the United States" under the section 641 definition. For this reason, he argues, the section 641 counts should have been dismissed.

█ In this circuit, whether funds are "money ... of the United States" under section 641 is measured by the control exercised by the federal government over the ultimate disposition of the funds. While some courts have focused on the government's property interest in embezzled funds, *see United States v. Fleetwood,* 489 F.Supp. 129, 133 (D.Or.1980), cases in this

---

4. *See, e. g., United States v. Krause,* 507 F.2d 113, 118 (5th Cir. 1975); *United States v.* *McGough,* 510 F.2d 598, 602 (5th Cir. 1975).

circuit agree that "[t]he key factor involved in this determination of federal interest is the supervision and control contemplated and manifested on the part of the government." *United States v. Evans*, 572 F.2d 455, 472 (5th Cir. 1978). Thus, we have held that funds embezzled from a private corporation which recovers federal student loan payments is embezzlement of federal money, *United States v. Evans, supra*, 572 F.2d at 474, and that embezzlement of tuition funds paid directly to a university also violates section 641, *United States v. Rowen*, 594 F.2d 98, 100 (5th Cir. 1979).

■ Applying the test of federal supervision and control, we find that the funds in this case were "money . . . of the United States" within the meaning of section 641. Although "[w]e may accept the argument that when an outright grant is paid over to the end recipient . . . the money in the grant ceases to be federal", *United States v. Smith*, 596 F.2d 662, 664 (5th Cir. 1979), that point has not been reached in this case. Here, McIntosh received the loan check directly from the FmHA. Although the check was payable to Tullos, the FmHA agreement required that McIntosh disburse the funds in accordance with a schedule of debts drawn up by the agency. Tullos' interest in the FmHA funds was limited to endorsing the check in McIntosh's possession and collecting any surplus after McIntosh had made the disbursements required by the FmHA. McIntosh's actions were even more closely controlled. After he acquired Tullos' endorsement, he was bound to deposit the funds in a designated FmHA escrow account, to disburse them only in accordance with specific instructions and promptly to report his compliance to the FmHA. Thus, the agency's control over the disposition of the funds was virtually complete, and the funds were "money . . . of

the United States" under the section 641 definition.[5] For this reason, the trial court's refusal to dismiss the charges was proper.

■■ The trial court also properly refused to sever the section 641 charges. Severance is within the discretion of the trial court and is required only in cases of compelling prejudice. *E. g., United States v. Horton*, 646 F.2d 181, 186 (5th Cir. 1981). Federal Rule of Criminal Procedure 8(a) provides for joinder of offenses charged when they are based on the same act or transaction. Here, the purported acts of embezzlement were part and parcel of the section 1001 count. McIntosh's inchoate assertions of prejudice are meritless. The refusal to sever was well within the trial court's discretion.

### IV.

■ McIntosh's final contention is that the prosecutor improperly restricted questioning during the grand jury investigation. This argument is insubstantial. The grand jury argument was not made to the trial court and the excerpts from the grand jury transcript cited by McIntosh are not part of the appellate record. As a result, we may not consider those excerpts on appeal. *See Ramirez v. Sloss*, 615 F.2d 163, 167 n.1 (5th Cir. 1980).

The judgment of conviction and commitment order is

AFFIRMED.

---

5. As additional evidence that the funds misused by McIntosh were "money . . . of the United States", we note that common law principles of escrow provide that title to funds held in escrow passes to the grantee only upon the performance of the agreed condition. The account in this case was unlike a traditional escrow account in that the funds were not held for Tullos pending the performance of a condition, but were to be paid directly to Tullos' creditors by the escrow agent. Nevertheless, the fact that the FmHA denominated the account an "escrow" account evinces the agency's desire to maintain control over the funds, and reinforces the conclusion that the funds were "money . . . of the United States" under this circuit's control and supervision analysis.