**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ann W. McREE, Joseph H. Hale,
Defendants–Appellants.**

No. 90–9022.

United States Court of Appeals,
Eleventh Circuit.

March 3, 1993.

Rehearing En Banc Granted
March 26, 1993.

---

Billy L. Spruell, Spruell & Dubuc, PC, Thomas R. Moran, Atlanta, GA, for McRee.

Jake Waldrop, Federal Defender Program, Inc., Atlanta, GA, for Hale.

Gale McKenzie, Asst. U.S. Atty., Atlanta, GA, Thomas M. Gannon, U.S. Dept. of Justice, Appellate Section—Crim. Div., Washington, DC, for U.S.

Before HATCHETT, EDMONDSON and BIRCH, Circuit Judges.

BIRCH, Circuit Judge:

Appellants Ann McRee and Joseph Hale appeal their convictions on charges arising out of an erroneously issued tax refund check that McRee and Hale cashed and dispersed. We find that the erroneously issued refund check was not government property. We, therefore, REVERSE McRee's and Hale's convictions.

## I. BACKGROUND

In February, 1985, the IRS filed a jeopardy assessment of over $1.9 million against Hale. The assessment, however, was not posted to Hale's IRS account. Over the next few months, the IRS seized and sold property belonging to Hale, McRee and McRee's mother to satisfy the assessment. Because the assessment was not posted to Hale's account, the account showed that Hale had overpaid his taxes, and the IRS computer generated a refund check to Hale for $359,380.25. Hale cashed the United States Treasury check and dispersed the proceeds through a series of transactions. The IRS later realized that Hale had been the recipient of an erroneous refund and attempted to recover the money.

The government brought criminal charges against Hale and McRee in August, 1987. The indictment alleged that Hale and McRee conspired to convert United States property in violation of 18 U.S.C. § 371, Count One; engaged in the interstate transportation of fraudulently converted property in violation of 18 U.S.C. § 2314, Counts Two–Six; and converted United States property in violation of 18 U.S.C. § 641, Count Seven. A jury found Hale and McRee guilty on all counts.

On appeal, McRee and Hale contend that the evidence adduced at trial failed to support their convictions on all counts. They also argue that the district court (1) improperly limited *voir dire*, (2) erred in rejecting their *Batson* challenge, (3) incorrectly excluded testimony offered by McRee and Hale's expert witness, and (4) erred in refusing to give an ignorance of the law instruction to the jury.

## II. DISCUSSION

All of the charges against Hale and McRee derive from the alleged violation of 18 U.S.C. § 641, which provides in pertinent part:

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the

United States or of any department or agency thereof, ...

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both....

The government must prove three elements in a Section 641 prosecution: (1) the property belonged to the government, (2) the defendant fraudulently used the property for his own purposes or the purposes of another, and (3) the defendant did so knowingly and willingly with the intent to either temporarily or permanently deprive the government of the property. *United States v. Lanier*, 920 F.2d 887, 895 n. 62 (11th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 208, 116 L.Ed.2d 166 (1991); *United States v. Burton*, 871 F.2d 1566, 1570 (11th Cir.1989) (per curiam).

Hale and McRee argue that the United States Treasury check was not government property when Hale received and cashed the check because the government did not retain control over the check. The government contends that because the check was erroneously issued it remained government property.

In *United States v. Rowen*, 594 F.2d 98 (5th Cir.), *cert. denied*, 444 U.S. 834, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979), the federal government transferred funds to various colleges as part of a student financial assistance program. The colleges were required to keep the funds in a separate bank account. Grants were then made to eligible students from the account. The defendant worked for a college that had received the government funds and induced the college to issue four checks to fictitious students. The defendant forged signatures on the checks and cashed them for her own use. Our predecessor court held that "the key factor" in determining whether the defendant had converted government property was "the supervision and control contemplated and manifested on the part of the government." *Id.* at 100 (quoting *United States v. Evans*, 572 F.2d 455, 472 (5th Cir.), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978)). Since the federal government had retained close control over the funds transferred to the col-

lege, the funds were still government property.

Similarly, in *United States v. Smith*, 596 F.2d 662 (5th Cir.1979), the federal government transferred funds to various colleges to support the federally created College Work–Study Program. The colleges in turn transferred the money to various students who qualified for grants. The defendants induced a college to draft checks to fictitious students from the college work-study funds. The defendants then cashed the checks for their own use. Again, the former Fifth Circuit ruled that the funds held by the college were government property because the funds were subject to substantial federal control. *Id.* at 664.

 The "supervision and control" test has thus been applied to determine whether funds that an entity has received from the federal government to be further disbursed to eligible recipients in a government program remain government property. *See United States v. Hope*, 901 F.2d 1013, 1019–20 (11th Cir.1990) (per curiam) (funds transferred to Dade County that were to be used to fund community development projects remained government property because they were subject to government control), *application and cert. denied*, 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991); *United States v. McIntosh*, 655 F.2d 80, 84 (5th Cir.1981) (grant transferred to closing attorney by Farmers Home Administration that was to be used to satisfy grantee's debts remained government property because the government retained control over the use of the funds), *cert. denied*, 455 U.S. 948, 102 S.Ct. 1450, 71 L.Ed.2d 662 (1982). To view the test in another way, it has been used to determine whether the intermediate entity is, in effect, an agent of the government for the purpose of administering and dispersing the funds. However, the test does not inform the decision as to when a check drafted by such an intermediate entity loses its character as government property. In none of these binding cases has the court applied the "supervision and control" test to analyze whether the checks drawn on the intermediary's funds were govern-

ment property. For example, in *Rowen* and *Smith*, the court did not find that the government retained supervision and control over the checks drafted by the colleges and payable to fictitious students.

█ In the present case, the "supervision and control" test provides limited guidance because funds held in the United States Treasury are obviously government property. The check drawn on Treasury funds and made payable to Hale was certainly government property when it was drafted. Nevertheless, the fact that the check was once government property does not mean that it always remains government property. In *Smith*, our predecessor court observed that "[w]e may accept the argument that when an outright grant is paid over to the end recipient, utilized, commingled or otherwise loses its identity, the money in the grant ceases to be federal." 596 F.2d at 664. This statement was adopted in subsequent cases. *Hope*, 901 F.2d at 1019; *McIntosh*, 655 F.2d at 84.

In deciding whether a check that was at its inception government property remains government property, we have focused upon the manner in which the defendant received the funds. In *McIntosh* and *Hope*, the defendants directly misappropriated funds from entities that were holding government funds. The defendants were thus diverting government property from its intended recipient. In *Rowen* and *Smith*, the defendants did not directly misappropriate the intermediate entity's funds but, instead, by some action induced the entity into wrongfully providing the government's funds to them.

█ In this case, Hale did not directly misappropriate the funds of the United States Treasury. Hale did nothing to induce the federal government to draft and send him the check. The lack of inducement is the fundamental difference between this case and the previous decisions noted above. Therefore, we conclude that the tax refund check *made payable to Hale* was no longer government property when the government *delivered that check to him* and he used the proceeds.[1]

█ Our holding in this case does not merge the first and third elements in a Section 641 prosecution that 1) the property must belong to the government, and 2) the conversion be intentional and knowing. The government must still prove that the defendant intentionally converted government property and not just that the defendant in some way induced a transfer of funds. We simply observe that the manner in which property is transferred may be relevant in determining ownership.[2]

1. We note that our decision may place us in arguable conflict with two other circuits. In *United States v. Spear*, 734 F.2d 1 (8th Cir.1984), the defendants continued to receive Social Security direct deposits into their bank account from the United States Treasury although the deposits should have been terminated when the defendants' mother died. There was no showing that the defendants induced the government to erroneously continue the payments. The Eighth Circuit held that the defendants were properly convicted under Section 641 because they had "dishonestly tak[en] advantage of the error by converting the funds to their own benefit." *Id.* at 2. However, those funds were intended for the then-deceased mother.

In *United States v. Miller*, 520 F.2d 1208 (9th Cir.1975), an erroneously drafted Treasury check was sent to a local entity charged with disbursing funds in connection with a health and planning project in Los Angeles. The executive director of the entity later misappropriated the funds from the check and was prosecuted under Section 641. The Ninth Circuit held the check was still government property even after the local entity received it. The court stated that "the check was improperly issued by the federal government, and the property right in that check never passed to [the local entity]." *Id.* at 1210.

2. It is here that we part ways with the dissent. The dissent focuses much of its discussion on the attempt of Hale and McRee to disperse the proceeds of the refund check. We agree with the dissent that these actions relate to the third element, intent. Our holding, however, is limited to the specific finding that the check was not government property after Hale received and cashed the check. The subsequent actions of Hale and McRee are independent of the determination that once Hale received and cashed the check it was no longer government property.

Hale also advances a plausible explanation for the complicated financial transactions used to disperse the check proceeds. Due to a lack of communication between the IRS and Hale, Hale believed that the IRS had seized more assets than it was owed. His actions were, thus, an

In summary, when the *named payee receives* and uses an erroneously issued tax refund check that the recipient in no way induced, the check is not government property under Section 641. Therefore, we find that Hale and McRee did not violate Section 641 because the check was not government property.

We also find support for our holding in the Internal Revenue Code. The Code recognizes that the government will on occasion commit errors in issuing tax refunds and has established a civil procedure for recovering erroneous refunds. 26 U.S.C. § 7405. It appears inconsistent that a government error that can be corrected by an established civil procedure may result in criminal liability depending on what the properly named recipient of the refund does with the money.

We note that the government was not without a proper remedy in this case to recover the money and punish Hale and McRee for thereafter concealing the proceeds. Not only could the government have pursued 26 U.S.C. § 7405 to recover the erroneously issued refund, but Hale and McRee were arguably prosecutable under 18 U.S.C. § 2232 for attempting to hide the proceeds of the erroneously issued check from the government so that such funds could not be recovered. Hale and McRee should not be punished under 18 U.S.C. § 641 because the government choose to prosecute under the wrong statute.

The finding that the erroneously issued refund check was not government property results in the collapse of all the other charges against Hale and McRee. If there was no conversion of government property, there could be no conspiracy to fraudulently convert government property (Count One), or interstate transportation of fraudulently converted property (Counts Two–Six). We, thus, need not reach the other issues that Hale and McRee have raised.

## III. CONCLUSION

We find that the check that Hale received and cashed was no longer government property under 18 U.S.C. § 641. Therefore, we REVERSE the convictions of Hale and McRee.

HATCHETT, Circuit Judge, dissenting:

Because the majority interprets the scope of prosecution under 18 U.S.C. § 641 too narrowly, I respectfully dissent.

The initial flaw in the majority's ruling is its failure to provide an adequate description of the circumstances giving rise to the government's prosecution in this case. The majority's statement that "Hale cashed the [$359,380.25] United States Treasury check and disbursed the proceeds through a series of transactions" far understates the underlying nature of the acts giving rise to this prosecution. Hale and McRee engaged in a maze of financial transactions in order to transform the $359,380.25 refund check into spendable cash, involving thirty checks for less than $10,000, four banks in three different states, a racetrack in a fourth state, a casino in a fifth state, multiple trips to the same bank on the same day, extensive and expensive interstate travel during the charged conversion process, disingenuous explanations to bank employees regarding their need for cash, inquiries at banks about currency transaction report (CTR) requirements, and the various false statements of McRee to Internal Revenue Service (IRS) agents about her possession of the proceeds of the refund check.*

Hale, who was in a Montgomery prison when the erroneously issued IRS check arrived at his former wife's Tampa residence, directed his former wife to deposit the entire $359,380.25 in a Fort Walton Beach, Florida bank account in her name. When the bank required additional proof of Hale's endorsement of the check, on July 29, 1985, Hale forwarded a notarized letter certifying his signature and then directed his former wife to reopen the Fort Walton

---

attempt to prevent the IRS from continuing what Hale believed were wrongful seizures.

* The numerous checks involving less than $10,-000 is significant because, in 1985, the govern-

ment required financial institutions and casinos to file a CTR, including name and address of the transactor and beneficiary, on every cash transaction involving more than $10,000.

Beach account in his name, using his former wife's Tampa, Florida, address.

McRee's involvement in the scheme began around July 30, 1985, when McRee opened an account at a Montgomery bank with an initial deposit of $100. During the next few months, McRee's banking activities included the following: (1) On August 9, 1985, McRee purchased fifteen cashier's checks (four $25,000 checks, ten $9,900 checks, and one $1,000 check) from the Fort Walton Beach bank using Hale's personal check to her for $200,000; (2) on August 9, 1985, McRee also cashed a personal check from Hale for $9,900, receiving ninety-nine $100 bills; (3) on August 12, 1985, McRee cashed three of the $25,000 cashier's checks at the Fort Walton Beach bank; (4) on August 13, 1985, McRee cashed a $9,900 cashier's check at the Fort Walton Beach bank, and also deposited Hale's personal checks for $9,900 and $130,000 in her Montgomery bank account; (5) on August 14, 1985, McRee opened an account at a Marietta, Georgia, bank, depositing a $9,900 cashier's check; (6) on August 15, 1985, McRee opened an account at an Atlanta, Georgia, bank, depositing a $25,000 cashier's check; (7) on August 15 and 16, 1985, McRee deposited a $9,900 cashier's check on each day in the Marietta bank; (8) on August 19, 1985, McRee cashed a Hale personal check for $9,500 at the Fort Walton Beach bank, and deposited another $9,900 cashier's check in the Atlanta bank; (9) on August 20 and 21, 1985, McRee cashed a $9,900 cashier's check each day at the Fort Walton Beach bank; (10) on August 26, 1985, McRee cashed a personal check for $9,900 at the Marietta bank, and also withdrew $9,900 from the Atlanta bank; (11) on August 27 and 28, 1985, McRee cashed a personal check for $9,500 and also cashed a $9,900 cashier's check at the Marietta bank; (12) on September 2, 1985, McRee purchased sixteen cashier's checks (ten $9,500 checks, two $8,500 checks, two $8,000 checks, one $6,000 check, and one $5,000 check) from the Montgomery bank using a personal check for $139,048. McRee continued to visit Hale in prison regularly throughout the time of these bank transactions.

McRee's activities also included financial transactions at the Canterbury Downs Racetrack in Shakopee, Minnesota, and the MGM Grand Casino in Las Vegas, Nevada; (1) on September 4, 1985, McRee negotiated two $9,500 cashier's checks at Canterbury Downs Racetrack; (2) on September 5, McRee negotiated eight $9,500 cashier's checks and two $8,000 cashier's checks at Canterbury Downs Racetrack; (3) on September 9, 1985, McRee negotiated two $8,500 cashier's checks and also a $5,000 cashier's check at the MGM Grand Casino; (4) on September 11, 1985, McRee purchased a $25,107.10 cashier's check from the Atlanta bank, then deposited this cashier's check and a $6,000 cashier's check into her account at the Marietta bank, and also cashed a personal check for $9,000. Again, McRee visited Hale in prison during the period of these transactions. In fact, Hale telephoned Canterbury Downs Racetrack to arrange for check-cashing privileges for McRee.

Although this evidence mainly related to the third—intent—element in a section 641 prosecution, which the majority does not reach, these facts provide essential background about the circumstances giving rise to the government's prosecution and the jury's conviction of Hale and McRee for criminal conversion under section 641. In light of these facts, it is not difficult to understand why a civil proceeding under 26 U.S.C. § 7405 would not provide an adequate basis for punishing Hale and McRee's activity.

In addition, the majority's recognition that the government could arguably have prosecuted Hale and McRee under 18 U.S.C. § 2232 does little more than acknowledge that Hale and McRee were engaged in prosecutable activity. Section 2232 prohibits a person from destroying or removing property in order to prevent seizure. The majority's assertion, however, that the government chose to prosecute Hale and McRee under the wrong statute misapprehends the discretionary nature of criminal prosecution under the Code. The mere existence of a basis for prosecution under one section of the Code does not preclude prosecution under a different section, if applicable. *See United States v.*

*Perez,* 707 F.2d 359, 362 (8th Cir.1983) (recognizing that the government did not err in charging a defendant with violation of section 641 even though either section 641 or section 2233 of Title 18 could have formed the basis for prosecution); *United States v. Spear,* 734 F.2d 1, 2 (8th Cir.1984) (reasoning that Congress did not intend to render 18 U.S.C. § 641 ineffectual merely in enacting 42 U.S.C. § 408 to provide for penalties for social security fraud and administrative procedures for adjustment of underpayments and overpayments). Thus, the majority is unpersuasive in bolstering its ruling with the mere existence of other civil and criminal bases for proceeding against Hale and McRee.

The ultimate basis for the majority's ruling is an erroneous conclusion that the government's property interest in the erroneously issued check ceased because of Hale's lack of any action to induce the government to draft and send him the check. As the majority acknowledges in a footnote, the Ninth Circuit has already rejected this narrow construction of the scope of section 641. *See United States v. Miller,* 520 F.2d 1208, 1210 (9th Cir.1975) (affirming a conviction under section 641 after concluding that the funds represented by an erroneously issued check did not pass from the federal government to the recipient, and that the government at all times retained a property interest in the money).

The majority concludes properly that this circuit's decisions have not resolved the issue which is decided today. The previous cases have, as the majority points out, dealt with instances where the federal government maintained sufficient "supervision and control" over federal funds so that the federal interest in the funds was clear. *See United States v. Hope,* 901 F.2d 1013, 1019–20 (11th Cir.1990) (affirming a conviction under section 641 after finding that the government retained sufficient supervision and control over federal funds, which the defendant had diverted after the government transferred the funds to Dade County for use in community development projects), *cert. denied,* 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991); *United*

*States v. Smith,* 596 F.2d 662, 664 (5th Cir.1979) (affirming a conviction under section 641 after finding that the government maintained sufficient supervision and control over the funds which the defendant fraudulently obtained while the funds were in transit between a federally funded college work-study program and the ultimate intended recipient); *United States v. Rowen,* 594 F.2d 98, 100 (5th Cir.1979) (affirming a conviction under section 641 after finding that the government maintained sufficient supervision and control over the funds of a federally funded student financial assistance program, which the defendant stole), *cert. denied,* 444 U.S. 834, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979). As the majority concludes, the "supervision and control" test applied in our previous cases provides limited guidance in this case which deals with a check drawn on United States Treasury funds, which is obviously government property when drafted.

It is error, however, for the majority to rely on dicta in *United States v. Smith* in order to avoid a thorough analysis of the issue of first impression which this case presents. In *Smith,* this court observed that "we may accept the argument that when an outright grant is paid over to the end recipient, utilized, commingled or otherwise loses its identity, the money in the grant ceases to be federal." 596 F.2d at 664; *see also Hope,* 901 F.2d at 1019. It is important that the *Smith* court continued, emphasizing that this circuit will continue to approach the meaning of government property under section 641 on a case-by-case basis: "we are not required to decide just where short of that point the line should be drawn. We continue to approach the problem on a case-by-case basis, but under present facts, application of general principles does not present great difficulty." *Smith,* 596 F.2d at 664. Hence, the dicta on where the line should be drawn to distinguish formerly federal funds from monies that have ceased to be federal is not, of itself, a sufficient basis for justifying the ruling which the majority announces.

Moreover, this case is distinguishable from the hypothetical scenario referred to in *Smith* and *Hope.* The *Smith* court appears to describe a situation where a stu-

dent financial aid recipient, for example, receives an outright grant which is subsequently stolen. Immediately following its description of this scenario, the *Smith* court observes that "its theft would not then be within the reach of 18 U.S.C. § 641." *Smith*, 596 F.2d at 664. Unlike the scenario of an outright recipient who rightfully receives federal funds outright and has monies stolen after first obtaining possession, this case involves a situation where the government's interest never ceased due to the erroneous nature of the disbursement. *See United States v. Miller*, 520 F.2d at 1210. The existence of a statutory mechanism for recovery of erroneous funds, 26 U.S.C. § 7405, underscores the continuing and strong federal interest in recovering the erroneous disbursement. *See, e.g., United States v. Carr*, 706 F.2d 1108, 1109–11 (11th Cir.1983) (recognizing that statutes and regulations concerning their issuance and replacement reveal a strong federal proprietary interest in stolen savings bonds).

But, the fundamental error in the majority's ruling does not depend on distinguishing dicta in previous rulings of this court. The error which the majority's ruling makes in limiting the reach of prosecution under section 641 is clearly demonstrated in the well-established principles articulated in *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). In construing Congress's intent in drafting section 641, the Court held that the purpose of Congress in drafting such a statute is to avoid gaps and loopholes between offenses. *Morissette*, 342 U.S. at 272–73, 72 S.Ct. at 254–55. Specifically on the issue of the scope of conversion under section 641, the Court recognized:

> It is not surprising if there is considerable overlapping in the embezzlement, stealing, purloining and knowing conversion grouped in this statute. What has concerned codifiers of the larceny type offense is that gaps or crevices have separated particular crimes of this general class and guilty men have escaped through the breaches. The books contain a surfeit of cases drawing fine distinctions between slightly different circumstances under which one may obtain wrongful advantages from another's property. The codifiers wanted to reach all such instances. Probably every stealing is a conversion, but certainly not every knowing conversion is a stealing. 'To steal means to take away from one in lawful possession without right with the intention to keep wrongfully.' [Citations omitted.] Conversion, however, may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful. Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use. Money rightfully taken into one's custody may be converted without any intent to keep or embezzle it merely by commingling it with the custodian's own, if he was under a duty to keep it separate and intact. It is not difficult to think of intentional and knowing abuses and unauthorized uses of government property that might be knowing conversions but which could not be reached as embezzlement, stealing or purloining. Knowing conversion adds significantly to the range of protection of government property without interpreting it to punish unwitting conversions.

*Morissette*, 342 U.S. at 271–72, 72 S.Ct. at 254.

Thus, the Supreme Court has long made it abundantly clear that courts should construe broadly the scope of the conversion offense under section 641 in order to fill the "gaps or crevices on the law on larceny-type offenses." The lesson in *Morissette* is that conversion under section 641 is to be construed to balance the government's interest in protection of its property and a defendant's interest in not being punished for "unwitting conversions." The majority ruling, to the contrary, construes section 641 so that guilty persons may escape based on a fine distinction in circumstances between those who induce the government to issue a check which they convert to their own uses unlawfully, and those who use government funds for their own uses unlawfully after having initially received the check without any wrongful

taking or impropriety. "Conversion, however, may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful." *Morissette*, 342 U.S. at 271–72, 72 S.Ct. at 254. Thus, the majority's holding that 18 U.S.C. § 641 does not reach instances where the government has overwhelming evidence that conversion was *not* "unwitting" is contrary to the well-established principles for construing the scope of section 641, and contrary to the basic contours of what constitutes criminal conversion.

I believe this court is bound to apply the standards for section 641 prosecution established in *Morissette*. Accordingly, I would hold that Hale and McRee did knowingly convert government property within the meaning of section 641, because the government at all times retained a property interest in the erroneously issued check regardless of the fact that Hale initially obtained possession lawfully. *See United States v. Miller*, 520 F.2d at 1210. I am persuaded that the mere recognition that the government retains a property interest in property even where a defendant obtained initial possession of government property lawfully does not result in a windfall for the government. Instead, as the Supreme Court recognized, the extended scope of prosecutions under section 641 strikes an appropriate balance between protection of government property and avoidance of punishing innocent conversions. *See Morissette*, 342 U.S. at 272, 72 S.Ct. at 254. That is, the government must still prove beyond a reasonable doubt that the defendants acted "knowingly and willfully with the intent to either temporarily or permanently deprive the government of its property." *See United States v. Lanier*, 920 F.2d 887, 895 n. 62 (11th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 208, 116 L.Ed.2d 166 (1991).

Having concluded that Hale and McRee did knowingly convert government property as proscribed in section 641, I would affirm the judgment of the district court because the appellants' other claims of error are completely without merit.

For all these reasons, I respectfully dissent.

## ORDER

March 26, 1993.

Before TJOFLAT, Chief Judge, FAY, KRAVITCH, HATCHETT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK and CARNES, Circuit Judges.

BY THE COURT:

A member of this court in active service having requested a poll on whether this case should be reheard by the Court sitting en banc, and a majority of the judges of this court in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that the above cause shall be reheard by this Court en banc. The previous panel's opinion is hereby VACATED.