UNITED STATES of America,
Plaintiff-Appellee,

v.

Steven Arthur CARR,
Defendant-Appellant.

No. 82–8320.

United States Court of Appeals,
Eleventh Circuit.

June 6, 1983.

Meals & Parks, Robert N. Meals, Atlanta, Ga., for defendant-appellant.

Julie E. Carnes, Howard J. Weintraub, Asst. U.S. Attys., Atlanta, Ga., for plaintiff-appellee.

Before RONEY and CLARK, Circuit Judges, and GIBSON *, Senior Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge:

Steven Arthur Carr was convicted after a bench trial of violating 18 U.S.C. § 641 (1976) by retaining, with the intent to convert to his own use, nineteen stolen United States Series E Savings Bonds. Carr seeks reversal of his conviction, claiming that the nineteen stolen bonds he possessed were not a "thing of value of the United States" within the meaning of 18 U.S.C. § 641. We reject this claim and affirm Carr's conviction.

I. *Factual Background*

The facts underlying Carr's conviction are not in dispute. In 1968, Lena Cavett reported as stolen nineteen of her United States Series E Savings Bonds, bearing a

* Honorable Floyd R. Gibson, U.S. Circuit Judge    for the Eighth Circuit, sitting by designation.

total face value of $2,675. The bonds were in the name of "Mrs. Lena M. Cavett." Mrs. Cavett applied to the United States Treasury Department for the issuance of replacement bonds. As part of her application, Mrs. Cavett agreed to surrender the stolen bonds to the Treasury Department should she ever recover the bonds. On October 15, 1969, the Treasury Department issued nineteen replacement bonds to Mrs. Cavett.

In the spring of 1981, Carr found the nineteen savings bonds that had been stolen from Mrs. Cavett twelve years earlier. Carr showed the bonds to Rex Adams, an employee in Carr's business, and to Lawrence Smith, Carr's business partner. Carr admitted to Adams and Smith that he knew the bonds were stolen and discussed with them the various ways of fraudulently redeeming the bonds, such as having "one of Carr's girl friends" pose as Lena Cavett and present the bonds to a bank for payment. Adams later told United States Secret Service agents about Carr's possession of the stolen bonds and the agents, with Adams' and Smith's aid, subsequently arranged to purchase the bonds from Carr. On December 28, 1981, Carr was arrested after he attempted to sell the stolen bonds to an undercover Secret Service agent for $1,200.

## II. *Discussion*

Title 18, United States Code, Section 641 provides in pertinent part: "Whoever receives, conceals, or retains [a thing of value of the United States] with the intent to convert it to his use or gain, knowing it to have been ... stolen ..." is guilty of an offense against the United States.

The issue presented here, which has thus far not been addressed by any federal circuit court of appeals, is whether United States savings bonds stolen from private citizens are "thing[s] of value of the United States."

### A. *Federal Interest in Stolen Bonds*

Carr first contends that the United States has no proprietary interest in savings bonds stolen from a private citizen. In *United States v. Evans,* 572 F.2d 455 (5th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 200,

58 L.Ed.2d 182 (1978), the court determined that an essential element of a violation of 18 U.S.C. § 641 is that the government suffer some actual property loss, which in turn requires that there be some federal interest in the stolen property at issue. *Id.,* 470–71. The *Evans* court observed:

> The decisions that have sustained findings of a sufficient federal interest in the property at issue have generally involved instances in which the government had either *title to, possession of, or control over the tangible object involved.* * * * However, the critical factor in determining the sufficiency of the federal interest in intangible interests * * * is the basic philosophy of ownership *reflected in relevant statutes and regulations.* * * * The key factor involved in this determination of federal interest is the supervision and control contemplated and manifested on the part of the government.

*Evans,* 572 F.2d at 471–72 (emphasis added). *See also United States v. McIntosh,* 655 F.2d 80, 83–84 (5th Cir.1981), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1450, 71 L.Ed.2d 662 (1982); *United States v. Smith,* 596 F.2d 662 (5th Cir.1979); *United States v. Rowen,* 594 F.2d 98, 100 (5th Cir.), *cert. denied,* 444 U.S. 834, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979). A review of the applicable statutes and regulations concerning the issuance of replacement bonds reveals a strong federal proprietary interest in the stolen savings bonds retained by Carr here.

Title 31, United States Code, Section 757c authorizes the Secretary of Treasury to issue United States savings bonds "in such manner and subject to such terms and conditions ... as the Secretary of Treasury may from time to time prescribe." Under this statutory provision, the Secretary has promulgated regulations, 31 C.F.R. §§ 315.-25 to 315.29, setting out the procedure for issuance of replacement bonds to citizens, like Mrs. Cavett, whose bonds have been lost, stolen, or destroyed. At the time Mrs. Cavett applied for her replacement bonds in 1969, 31 C.F.R. § 315.28 provided that "if [a stolen bond is] recovered or received after relief is granted, the bond should be surren-

**1110**

dered promptly to the [Bureau of the Public Debt] for cancellation." 31 C.F.R. § 315.28 (1969). In 1974, this section underwent some refinement and provided that "[a] bond which is recovered after relief therefor has been granted *belongs to the United States* and shall be promptly surrendered for cancellation." 31 C.F.R. § 315.28 (1974) (emphasis added). The present version of this section, and the version in existence at the time Carr possessed the stolen bonds provides that "[a] bond for which relief has been granted *is the property of the United States* and, if recovered, must be promptly submitted to the Bureau of the Public Debt ... for cancellation." 31 C.F.R. § 315.-28(b) (1982) (emphasis added). Thus, by its own terms, 31 C.F.R. § 315.28 establishes that title to stolen bonds reverts to the United States upon its issuance of replacement bonds.[1]

Carr concedes that 31 C.F.R. § 315.-28 gives the United States a "possibility of reverter" in stolen bonds when replacement bonds have been issued for them. However, he claims the United States' title interest defined by this section applies only to the relationship between the government and the original owner of the bonds, and does not apply to the relationship between the government and all of the world. We disagree. First, the plain language of the regulation does not warrant such an interpretation. Second, the apparent purpose underlying the United States' right to regain possession of the stolen bonds is to protect itself from incurring a double obligation on a single debt. Until the stolen bonds have been physically tendered by their finder to the Bureau of Public Debt, the United States is exposed to the risk of erroneous payment on the bonds by one of 40,000 paying agents throughout the United States.[2] For instance, as a Treasury Department official testified at trial, if the imposter-presenter of stolen bonds fraudulently executes a request for payment and provides one of three permissible forms of identification showing that she is the bond-owner/payee (i.e., Mrs. Lena Cavett), then the paying agent is required to cash the bonds and the United States must in turn reimburse the paying agent.[3] Because the

1. The government has also expressly provided for the transfer of title back to the United States by requiring the registered owner applying for replacement bonds to sign the following declaration: "[I]f such relief is granted, [we] hereby acknowledge that the original bonds shall thereupon become the property of the United States. Upon the granting of relief, we hereby assign all our right, title and interest to and in the original bond to the United States." FORM P.D. 1048

2. A paying agent includes commercial banks, trust companies, savings banks, savings and loan institutions, credit unions, industrial banks and similar institutions.

3. The Treasury Department's "Identification Guide for Cashing United States Savings Bonds" provides:
1. AGENT'S RESPONSIBILITY AND LIABILITY. A paying agent is required to cash bonds eligible for payment for a presenter with adequate identification.
    *If a paying agent cashes a bond for the wrong person, the agent is liable for the loss unless the Treasury is able to determine that the loss was not due to fault or negligence on the part of the agent.*
    The Treasury will be able to determine that the loss was not due to fault or negligence on the part of the agent if this Guide is followed.

Agents can therefore carry out their responsibility for cashing bonds and yet be sure they will not incur losses if they—
    examine each bond to determine that it is eligible for payment and that the request for payment is properly executed,
    require identification that is adequate under this Guide, and
    make a notation that is adequate under this Guide.
2. IDENTIFICATION. There are three kinds of identification—as a customer, by known persons, and by documents.
    *Customer identification.* Identification through a customer account is adequate if the presenter of the bond is a customer—
    whose name has been on the account at least six months, and
    whose signature on the request for payment compares favorably with the signature on file.
    *Personal identification.* Identification by another person is adequate if—
    the identifier is a customer, as described above, or is personally known to an officer of the paying agent,
    in response to questions, it is determined that the identifier knows the presenter by the name inscribed on the bond and that

United States bears this risk of erroneous payment as long as the stolen bonds are outstanding, we cannot believe that the government's interest in regaining possession of the stolen bonds is limited to situations where the finder of the stolen bonds happens to be the original purchaser.

By finding that the United States has title to and hence the right to possession of the stolen bonds here, we need not consider the other indicia of federal property interest set out in *Evans*—i.e., "possession of" and "control over" the stolen bonds. *Evans,* 572 F.2d at 471. We note, however, that while the government cannot exercise actual possession or control over stolen bonds the whereabouts of which are unknown, the requirement of 31 C.F.R. § 315.-28 that the finder of stolen bonds return them to the Bureau of Public Debt for cancellation evinces the greatest amount of "supervision and control" that the government could exercise under the circumstances. *See Evans,* 572 F.2d at 472.[4]

### B. *Value of Stolen Savings Bonds*

Carr alternatively contends that even assuming the government has a property interest in the stolen bonds, the stolen bonds were not a "thing of value" as required by 18 U.S.C. § 641. Carr suggests that unlike stolen Treasury checks and stolen blank money orders, stolen bonds that have been replaced are worthless and are simply destroyed by the government once they are recovered.

We disagree with this contention and conclude that uncancelled stolen savings bonds that have been replaced but have not been recovered by the United States government are "thing[s] of value of the United States." Unrecovered stolen savings bonds represent, on their face, an uncancelled government debt to the named payee in the amount of their redemption value. Accordingly, as mentioned above, as long as those bonds remain outstanding, the government is exposed to the risk of loss from erroneous payment on them. The stolen bonds would undoubtedly have some value on the "thieves market" and could possibly be used as collateral in a fraudulent loan transaction. Thus, the stolen savings bonds are "things of value" inasmuch as the government's recovery of them would eliminate this risk of loss from erroneous payment, and also eliminate possible risks of loss to innocent persons. As has been long recognized by economists and the financial community, the reduction or elimination of risk of loss on financial instruments constitutes economic value.[5]

---

the source and duration of his acquaintance with the presenter are such as to make his identification reliable, and
the identifier places his signature on the back of the bond.
*Documentary identification.* Documents adequate for identification of persons presenting bonds are specified on the back of this Guide. Because documentary identification is less reliable than other forms of identification, no more than $1,000 may be paid at any one time on documentary identification alone. The $1,000 limitation applies regardless of the number of different documents presented as identification.
Every document must be examined to determine that—
there is nothing that would raise a suspicion about its genuineness,
the name in which the document is issued is the same as the name on the bond, and
the signature and the picture or physical description compare favorably with those of the presenter.
3. NOTATION OF IDENTIFICATION. A notation is adequate if it—

is recorded on the bond or in a separate record at the time of payment, and
is sufficiently detailed to permit, at a later date, a determination of the exact identification actually used.

**4.** Carr relies on *United States v. Fleetwood,* 489 F.Supp. 129 (D.Or.1980), where the court concluded that the government did not have a sufficient property interest in savings bonds stolen from the private possession of third party owners. However, the *Fleetwood* case is of questionable authority because the court there completely failed to consider 31 C.F.R. § 315.-28 which explicitly establishes the government's property interest in the stolen bonds for which replacement bonds have been issued. The *Fleetwood* court also ignored the government's exposure to the risk of erroneous payment on stolen savings bonds.

**5.** See Scott, "The Risk Fixers," 91 Harv.L.R. 737, 738–40, 772–75, 792 (1978); *see generally* Posner, *Economic Analysis of Law,* 191–93, 214 (1972); Sherman, *The Economics of Industry,* 114–15 (1974).

Other courts have expressly or impliedly adopted a risk of loss rationale in applying § 641 to possessors of stolen United States negotiable instruments, such as Treasury checks. *See United States v. Forcellati,* 610 F.2d 25, 30–32 (1st Cir.1979), *cert. denied,* 445 U.S. 944, 100 S.Ct. 1342, 63 L.Ed.2d 778 (1980) (Government's risk of double payment on same debt where defendant possessed stolen Treasury check sufficient to establish violation under § 641); *United States v. Edwards,* 473 F.Supp. 81, 82–83 (D.Mass.1979) (same); *accord United States v. O'Kelly,* 701 F.2d 758, 759 (8th Cir.1983; per curiam); *see also United States v. Miller,* 520 F.2d 1208, 1210 (9th Cir.1975). In the stolen Treasury check cases, the government bears a risk of double payment on the same debt through the theft of the check and its instrumental use by someone other than the intended payee. *Forcellati,* 610 F.2d at 32; *Edwards,* 473 F.Supp. at 82–83. While savings bonds, unlike Treasury checks, are nonnegotiable instruments, we do not view this distinction as controlling; the government bears a risk of double payment whether stolen negotiable or nonnegotiable instruments are involved. In fact, under some circumstances, the government bears a greater risk of loss on stolen savings bonds than it does on stolen Treasury checks. For instance, if a bank cashes a stolen Treasury check containing an imposter-presenter's forged endorsement of the payee's name, the bank is ultimately liable for its own erroneous payment on the check. U.C.C. §§ 4–401(1), 3–417, and 4–207 (1976); *see also* White and Summers, *Uniform Commercial Code,* 492–95 (1972); *Edwards,* 473 F.Supp. at 82–83. However, if a bank cashes a stolen savings bond where the imposter-presenter has adequately, though fraudulently executed a request for payment and identified himself as the bondowner/payee, the nonnegligent bank will be reimbursed by the government. *Supra,* n. 3. Yet the government would still have to pay the redemption price on the replacement bonds issued to the original owner of the stolen bonds.

Moreover, despite Carr's claim, the government's risk of loss on the stolen savings bonds here was anything but speculative. Carr certainly possessed, and indeed knew he possessed, the "creative capacity" to successfully, though fraudulently redeem the stolen bonds at the government's expense. *See United States v. Wright,* 661 F.2d 60, 61–62 (5th Cir.1981) (Value requirement of § 641 met by defendant's creative capacity to use stolen postal money order machines to produce authentic though fraudulent money orders); *compare United States v. Bullock,* 451 F.2d 884, 890 (5th Cir.1971) (Value requirement of § 641 met by defendant's filling in amount on stolen blank money orders). The evidence presented at trial indicated that Carr told others of his intention to have a girl friend obtain identification in the name of "Lena Cavett," open up an account at a bank, and then redeem the bonds. A Treasury Department official testified that under the dictates of the "Treasury Department's Guide for Cashing United States Savings Bonds" (*see supra,* n. 3), Carr could have employed at least two methods to successfully redeem the bonds at an expense to the government of over $6,000.[6] First, Carr's girl friend could have opened up a bank account in the name of "Lena Cavett," maintained the account for six months, and then presented the stolen bonds for payment. If the Cavett-imposter's signature on her request for payment compared favorably with her signature when she opened the account, the bank would be required to cash the bonds and the government would have to reimburse the bank for the full amount paid by the bank. Second, Carr's girl friend could have obtained a Georgia driver's license in the name of "Lena Cavett," presented the license along with the stolen bonds at any bank, and cashed up to $1,000 worth of the stolen bonds at any one time. As long as the driver's license appeared genuine, was in

---

**6.** Although the stolen bonds had a face value of $2,675 as of December 1981 when appellant attempted to sell the bonds to the undercover Secret Service agent, the bonds bore a redemption value of $6,268.80.

the name of "Lena Cavett" and bore a signature, picture, and physical description that compared favorably with the signature and appearance of the imposter, the bank would be required to cash up to $1,000 worth of the bonds and the government would have to reimburse the payor bank. In either of the above two situations, the government would still have to pay Mrs. Cavett the redemption value of her replacement bonds.

We therefore conclude that the value requirement of § 641 was met by the government's showing that the uncancelled stolen savings bonds Carr possessed represented a risk of loss to the government from the erroneous payment on the bonds.[7] As such, the stolen bonds were of significantly more value to the government than the mere cost of replacing the bonds.

Judgment AFFIRMED.

---

**7.** While the government did not attempt to satisfy the value requirement by demonstrating the value of the stolen bonds in a "thieves market," Carr's attempted sale of the bonds for $1,200 established his own perception as to the value of fraudulently redeeming the bonds. See United States v. Wright, 661 F.2d at 61. Compare United States v. Bullock, 451 F.2d 884 (5th Cir.1971); United States v. Moore, 571 F.2d 154, 156 (3d Cir.), cert. denied, 435 U.S. 956, 98 S.Ct. 1589, 55 L.Ed.2d 808 (1978).