**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ann W. McREE, Joseph H. Hale,
Defendants–Appellants.**

**No. 90–9022.**

United States Court of Appeals,
Eleventh Circuit.

Nov. 22, 1993.

---

Billy L. Spruell, Spruell & Dubuc, PC, Thomas R. Moran, Atlanta, GA, for McRee.

Jake Waldrop, Federal Defender Program, Inc., Atlanta, GA, for Hale.

Gale McKenzie, Asst. U.S. Atty., Atlanta, GA, Thomas M. Gannon, U.S. Dept. of Justice, Appellate Section—Crim. Div., Washington, DC, for U.S.

Before TJOFLAT, Chief Judge, FAY, KRAVITCH, HATCHETT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK, and CARNES, Circuit Judges.

HATCHETT, Circuit Judge:

In this appeal interpreting 18 U.S.C. § 641, we affirm the appellants' convictions and hold that the government does not lose its property interest in an erroneously issued check even in circumstances where the recipient has done nothing to induce the issuance of the check.

## BACKGROUND

On February 28, 1985, the Internal Revenue Service (IRS) issued a jeopardy assessment in the amount of $1.9 million against Joseph Hale and his corporations. Because Hale was incarcerated at a federal prison in Montgomery, Alabama for prior convictions on securities fraud and perjury, Hale gave power of attorney to Ann McRee, and Paul Wagner, an attorney, for purposes of appealing the jeopardy assessment. The IRS upheld the jeopardy assessment after considering the McRee and Wagner appeal, and on April 15, 1985, the IRS mailed Hale a Denial of Appeal of Jeopardy Assessment with Notice of Right to Appeal to District Court. Hale did not exercise his right to appeal the jeopardy assessment to a United States district court.

The IRS collected approximately $340,000 through seizures and sales of property belonging to Hale, McRee, and McRee's mother, as a partial satisfaction of the jeopardy assessment. The IRS failed, however, to post the $1.9 million jeopardy assessment to Hale's computerized IRS account. Consequently, the IRS computer misinterpreted the approximately $340,000 as an overpayment rather than as a partial satisfaction of the jeopardy assessment. On July 5, 1985, the IRS computer generated a refund check to Hale and his former wife in the amount of $359,380.25. The IRS did not discover that it had issued an erroneous refund check until early September, 1985.

During the next several months, Hale and McRee engaged in a maze of financial transactions in order to transform the $359,380.25 refund check into spendable cash. These transactions involved thirty checks for less than $10,000, four banks in three different states, a racetrack in a fourth state, a casino in a fifth state, multiple trips to the same bank on the same day, extensive and expensive interstate travel during the charged conversion process, disingenuous explanations to bank employees regarding their need for cash, inquiries at banks about currency transaction report (CTR) requirements, and

the various false statements of McRee to Internal Revenue Service (IRS) agents about her possession of the proceeds from the refund check.[1]

Hale, who was still in the Montgomery prison when the erroneously issued IRS check arrived at his former wife's Tampa residence, directed his former wife to deposit the entire $359,380.25 in a Fort Walton Beach, Florida bank account in her name. When the bank required additional proof of Hale's endorsement of the check, on July 29, 1985, Hale forwarded a notarized letter certifying his signature and then directed his former wife to reopen the Fort Walton Beach account in his name, using his former wife's Tampa, Florida, address.

McRee's involvement in the scheme began around July 30, 1985, when McRee opened an account at a Montgomery bank with an initial deposit of $100. During the next few months, McRee's banking activities included the following: (1) On August 9, 1985, McRee purchased fifteen cashier's checks (four $25,000 checks, ten $9,900 checks, and one $1,000 check) from the Fort Walton Beach bank using Hale's personal check to her for $200,000; (2) on August 9, 1985, McRee also cashed a personal check from Hale for $9,900, receiving ninety-nine $100 bills; (3) on August 12, 1985, McRee cashed three of the $25,000 cashier's checks at the Fort Walton Beach bank; (4) on August 13, 1985, McRee cashed a $9,900 cashier's check at the Fort Walton Beach bank, and also deposited Hale's personal checks for $9,900 and $130,000 in her Montgomery bank account; (5) on August 14, 1985, McRee opened an account at a Marietta, Georgia, bank, depositing a $9,900 cashier's check; (6) on August 15, 1985, McRee opened an account at an Atlanta, Georgia, bank, depositing a $25,000 cashier's check; (7) on August 15 and 16, 1985, McRee deposited a $9,900 cashier's check on each day in the Marietta bank; (8) on August 19, 1985, McRee cashed a Hale personal check for $9,500 at the Fort Walton Beach bank, and deposited another $9,900 cashier's check in the Atlanta bank; (9) on August 20

1. The numerous checks involving less than $10,000 is significant because, in 1985, the government required financial institutions and casinos to file a CTR, including name and address of the transactor and beneficiary, on every cash transaction involving more than $10,000.

and 21, 1985, McRee cashed a $9,900 cashier's check each day at the Fort Walton Beach bank; (10) on August 26, 1985, McRee cashed a personal check for $9,900 at the Marietta bank, and also withdrew $9,900 from the Atlanta bank; (11) on August 27 and 28, 1985, McRee cashed a personal check for $9,500 and also cashed a $9,900 cashier's check at the Marietta bank; (12) on September 2, 1985, McRee purchased sixteen cashier's checks (ten $9,500 checks, two $8,500 checks, two $8,000 checks, one $6,000 check, and one $5,000 check) from the Montgomery bank using a personal check for $139,048. McRee continued to visit Hale in prison regularly throughout the time of these bank transactions.

McRee's activities also included financial transactions at the Canterbury Downs Racetrack in Shakopee, Minnesota, and the MGM Grand Casino in Las Vegas, Nevada; (1) on September 4, 1985, McRee negotiated two $9,500 cashier's checks at Canterbury Downs Racetrack; (2) on September 5, 1985, McRee negotiated eight $9,500 cashier's checks and two $8,000 cashier's checks at Canterbury Downs Racetrack; (3) on September 9, 1985, McRee negotiated two $8,500 cashier's checks and also a $5,000 cashier's check at the MGM Grand Casino; (4) on September 11, 1985, McRee purchased a $25,107.10 cashier's check from the Atlanta bank, then deposited this cashier's check and a $6,000 cashier's check into her account at the Marietta bank, and also cashed a personal check for $9,000. Again, McRee visited Hale in prison during the period of these transactions. In fact, Hale telephoned Canterbury Downs Racetrack to arrange for check-cashing privileges for McRee.

In September, 1985, the IRS sent Hale a demand for repayment of the proceeds from the erroneous refund check, which Hale refused. On August 19, 1987, a grand jury indicted Hale and McRee on seven counts charging conspiracy to convert United States property in violation of 18 U.S.C. § 371, conversion of United States property in violation of 18 U.S.C. § 641, and engaging in the interstate transportation of fraudulently converted property in violation of 18 U.S.C. § 2314. On July 27, 1990, a jury found Hale and McRee guilty on all counts. Hale and McRee moved for a judgment of acquittal, and alternatively, a new trial, alleging legally insufficient evidence to establish that the refund check belonged to the United States or to establish that Hale and McRee acted with the requisite specific intent. Hale and McRee also moved for a new trial claiming that the district court improperly limited voir dire to exclude questioning of prospective jurors about whether fear of retribution from the IRS would affect their ability to be fair and impartial. On October 16, 1990, the district court issued an order denying both motions.

## ISSUE AND CONTENTIONS

On appeal, Hale and McRee challenge their convictions claiming that the district court erred in refusing to acquit based on: (1) insufficiency of the evidence to support their convictions on all counts; (2) improper limitation of voir dire to exclude questioning of prospective jurors about their fear of retribution from the IRS; (3) improper rejection of their claim of racial discrimination in jury selection under *Batson*; (4) improper exclusion of the testimony of Hale's and McRee's tax expert as unduly confusing, consisting of legal opinions, and prejudicial under Fed. R.Evid. 702, 704(a), and 403; and (5) improper refusal to give an ignorance of the law instruction to the jury. In this opinion, we discuss Hale's and McRee's arguments that the evidence was insufficient to support their conviction of unlawful conversion of government property under 18 U.S.C. § 641.[2] We find all of Hale's and McRee's other claims of error to be without merit and warranting no further discussion.

## DISCUSSION

We are asked to decide whether the proceeds of an erroneously issued IRS refund check represent government property for purposes of criminal prosecution under 18

2. A panel of this court issued an opinion reversing Hale's and McRee's convictions, but the court subsequently vacated that panel opinion and ordered that the case be reheard *en banc*. *See United States v. McRee*, 984 F.2d 1144 *vacated and reh'g en banc granted* (11th Cir.1993).

U.S.C. § 641. Section 641 provides in the pertinent part:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof; or
>
> Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted ...
>
> Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

18 U.S.C.A. § 641 (West 1976). In reviewing a conversion prosecution under section 641, this court has referenced the following three elements: (1) that the money or property belonged to the government; (2) that the defendant fraudulently appropriated the money or property to his own use or the use of others; (3) and that the defendant did so knowingly and willfully with the intent either temporarily or permanently to deprive the owner of the use of the money or property. *See United States v. Lanier*, 920 F.2d 887, 895 n. 62 (11th Cir.) (noting the three elements referenced in cases that deal with embezzlement prosecutions under section 641), *cert. denied*, —— U.S. ——, 112 S.Ct. 208, 116 L.Ed.2d 166 (1991); *see also United States v. Burton*, 871 F.2d 1566, 1570 (11th Cir.1989) (reviewing an embezzlement prosecution under section 641, and requiring that the government prove as the second element, "that the property lawfully came into the possession or care of the defendant, and the defendant fraudulently appropriated the money or property to his own use or the use of others").

### Government Property

■ Hale and McRee contend that the government presented legally insufficient evidence on the first element that must be proved in a section 641 prosecution—property belonging to the United States. They argue that the erroneously issued IRS refund check was not government property as a matter of law, because the government did not retain "supervision and control" over the check which named Hale as the payee. The government responds that the "supervision and control" test is not applicable to this case, and argues instead that it properly prosecuted Hale and McRee under section 641 because the United States retains a property interest in the proceeds of an IRS refund check that is mistakenly issued.

We agree with the government that the "supervision and control" test for determining government property, is inapplicable to this case. Previously, this court has applied the "supervision and control" test in cases dealing with section 641 prosecutions for misappropriation of funds from an intermediate entity that has received government monies for further disbursement to eligible recipients. *See United States v. Hope*, 901 F.2d 1013, 1019–20 (11th Cir.1990) (affirming a conviction under section 641 after finding that the government retained sufficient supervision and control over federal funds, which the defendant diverted after the government transferred the funds to Dade County for use in community development projects), *cert. denied*, 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991); *United States v. Smith*, 596 F.2d 662, 664 (5th Cir. 1979) (affirming a conviction under section 641 after finding that the government maintained sufficient supervision and control over the funds which the defendant fraudulently obtained while the funds were in transit between a federally funded college work-study program and the ultimate intended recipient); *United States v. Rowen*, 594 F.2d 98, 100 (5th Cir.1979) (affirming a conviction under section 641 after finding that the government maintained sufficient supervision and control over the funds of a federally funded student financial assistance program, which the defendant stole), *cert. denied*, 444 U.S. 834, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979).

Because this case involves a check drawn directly on United States Treasury funds, which is obviously government property when drafted, the "supervision and control" test provides limited guidance for determining whether the government retains a property interest in the proceeds of an erroneously issued United States Treasury check.

Hence, we reject Hale's and McRee's argument that the evidence was insufficient merely because the government did not prove that it exercised supervision and control over the proceeds of the erroneously issued IRS check.

Hale and McRee also argue that the evidence was insufficient as a matter of law, because the refund check ceased to be government property and became Hale's property upon his receipt. They rely on dicta in the *Smith* decision, where this court observed that "we may accept the argument that when an outright grant is paid over to the end recipient, utilized, commingled or otherwise loses its identity, the money in the grant ceases to be federal." 596 F.2d at 664; *see also Hope,* 901 F.2d at 1019. The *Smith* court continued with an explanation that "we are not required to decide just where short of that point the line should be drawn. We continue to approach the problem on a case by case basis, but under present facts, application of general principles does not present great difficulty." *Smith,* 596 F.2d at 664.

Contrary to Hale's and McRee's argument, the facts of this case are distinguishable from the hypothetical scenario described in *Smith.* The *Smith* court describes a situation where an intended student financial aid recipient, for example, receives an outright grant which is subsequently stolen. Immediately following its description of this scenario, the *Smith* court observes that "its theft would not then be within the reach of 18 U.S.C. § 641." *Smith,* 596 F.2d at 664. Unlike the scenario of a recipient who rightfully receives federal funds outright and has monies stolen after first obtaining possession, this case involves a situation where a recipient receives an erroneously issued check representing funds that the government never intended for the recipient. We reject the argument that the government's property interest ceased as a matter of law upon Hale's receipt of the check, and hold that the government at all times retained a property interest in the proceeds of the *erroneously* issued United States Treasury check. *Accord United States v. Miller,* 520 F.2d 1208, 1210 (9th Cir.1975) (affirming a conviction under section 641 after concluding that the funds represented by an erroneously issued check did not pass from the federal government to the recipient, and that the government at all times retained a property interest in the money).[3]

Additionally, Hale and McRee argue that the evidence was insufficient based on the absence of any evidence showing that Hale somehow induced the IRS to issue the refund check. We reject this argument based on the principles that the Supreme Court articulated in *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). In construing Congress's intent in drafting section 641, the Court held that the purpose of Congress in drafting such a statute is to avoid gaps and loopholes between offenses. *Morissette,* 342 U.S. at 272–73, 72 S.Ct. at 254–55. Specifically on the issue of the scope of conversion under section 641, the Court recognized:

> It is not surprising if there is considerable overlapping in the embezzlement, stealing, purloining and knowing conversion grouped in this statute. What has concerned codifiers of the larceny type offense is that gaps or crevices have separated particular crimes of this general class and guilty men have escaped through the breaches. The books contain a surfeit of cases drawing fine distinctions between slightly different circumstances under which one may obtain wrongful advantages from another's property. The codifiers wanted to reach all such instances. Probably every stealing is a conversion, but certainly not every knowing conversion is a stealing. 'To steal means to take away from one in lawful possession without right with the intention to keep wrongfully.' [Citations omitted.] Conversion, however, may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the convert-

---

**3.** We find further support for our conclusion in the existence of a statutory mechanism for recovery of erroneous funds, 26 U.S.C. § 7405, which underscores the continuing and strong federal interest in recovering erroneous disbursements.

*See, e.g., United States v. Carr,* 706 F.2d 1108, 1109–11 (11th Cir.1983) (recognizing that statutes and regulations concerning their issuance and replacement reveal a strong federal proprietary interest in stolen savings bonds).

er was entirely lawful. Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use. Money rightfully taken into one's custody may be converted without any intent to keep or embezzle it merely by commingling it with the custodian's own, if he was under a duty to keep it separate and intact. It is not difficult to think of intentional and knowing abuses and unauthorized uses of government property that might be knowing conversions but which could not be reached as embezzlement, stealing or purloining. Knowing conversion adds significantly to the range of protection of government property without interpreting it to punish unwitting conversions.

*Morissette,* 342 U.S. at 271–72, 72 S.Ct. at 254.

■ Thus, it is well-established that courts must construe the scope of the conversion offense under section 641 in order to fill the "gaps or crevices on the law on larceny-type offenses." The holding in *Morissette* requires that courts interpret section 641 in order to balance the government's interest in protection of its property and a defendant's interest in not being punished for "unwitting conversions." Hale and McRee urge this court to construe section 641 so that guilty persons may escape based on a fine distinction in circumstances between those who induce the government to issue a check which they convert to their own uses unlawfully, and those who use government funds for their own uses unlawfully after having initially received the check without any wrongful taking or impropriety. "Conversion, however, may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful." *Morissette,* 342 U.S. at 271–72, 72 S.Ct. at 254. This court is bound to apply the standards for section 641 prosecution established in *Morissette.* We hold that the government does not lose its property interest for conversion prosecutions under section 641 merely because the recipient does nothing to induce the issuance of a United States Treasury check. Accordingly, we re-

ject Hale's and McRee's argument that the evidence was legally insufficient based on the lack of evidence showing that Hale induced the IRS to issue the refund check.

We note that our recognition that the government retained a property interest in the erroneously issued refund check even where Hale obtained initial possession lawfully, does not result in a windfall for the government. Instead, as the Supreme Court recognized, the scope of prosecutions under section 641 strikes an appropriate balance between protection of government property and avoidance of punishing innocent conversions. *See Morissette,* 342 U.S. at 272, 72 S.Ct. at 254–55. That is, the government must still prove beyond a reasonable doubt that the defendants acted "knowingly and willfully with the intent to either temporarily or permanently deprive the government of its property." *See United States v. Lanier,* 920 F.2d at 895 n. 62.

*Specific Intent*

■ Hale and McRee contend that evidence in this case is legally insufficient to prove the third, specific intent element under section 641. Hale and McRee argue that they presented undisputed evidence showing that Hale cashed the refund check with the good faith belief, based on advice from his attorney, that the check belonged to him. Hale and McRee further assert that the evidence shows that Hale believed the IRS had already seized more than enough assets to satisfy the jeopardy assessment, and thus they engaged in the complicated financial transactions in order to prevent what Hale believed to be wrongful seizures.

In reviewing sufficiency of the evidence claims, we evaluate the evidence in the light most favorable to the government and determine whether any reasonable jury could find that the evidence established the requisite elements beyond a reasonable doubt. *United States v. Bell,* 678 F.2d 547, 549 & n. 3 (5th Cir. Unit B 1982) (en banc) (explaining that a jury need not exclude every reasonable hypothesis of innocence, and noting that circumstantial evidence is not intrinsically different from testimonial evidence), *aff'd on*

*other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

Contrary to Hale's and McRee's arguments, we find that the government presented sufficient evidence to prove that Hale and McRee acted knowingly and willfully with the intent to either temporarily or permanently deprive the government of its property. Besides the circumstantial evidence of intent regarding the maze of financial transactions, as discussed earlier, the government also presented evidence tending to rebut Hale's and McRee's good faith claims. For example, the government presented documents in which Hale indicated his awareness that his corporations were suffering from such severe financial problems that non-IRS creditors might not be paid in light of the jeopardy assessment. As the government argued, Hale's awareness of the insufficiency of his assets made it unlikely that he really believed he could satisfy the jeopardy assessment, let alone overpay it with nearly $360,-000. In addition, the government presented evidence showing that the IRS and various financial institutions sent Hale and his attorney numerous notices of continuing seizures during the time of the July–September financial transactions, making it even more obvious that the jeopardy assessment had not been satisfied.

Moreover, to rebut Hale's defense of good faith reliance on the advice of counsel, the government presented evidence that the attorney, a friend of Hale's for thirty years, offered a verbal opinion on the legality of cashing the check after only a moment's reflection, with no research, no inquiries at the IRS, no consultation with Hale's other attorneys, and no written notes. Based on the tremendous circumstantial evidence of specific intent and the evidence rebutting the claims of good faith, we hold that the government did present sufficient evidence to prove

specific intent. Accordingly, we affirm Hale's and McRee's convictions under section 641 for the unlawful conversion of property belonging to the United States.

## CONCLUSION

We reject each of Hale's and McRee's sufficiency of the evidence arguments, and hold the evidence was legally sufficient to prove that the proceeds from the erroneously issued IRS refund check represented government property under 18 U.S.C. § 641. We also hold that the government presented sufficient evidence to prove that Hale and McRee acted knowingly and willfully with the intent to deprive the government of its property interest in the proceeds from the erroneously issued refund check. We find all other claims of error to be meritless. Accordingly, we affirm the Hale and McRee convictions for conspiracy to convert, conversion, and the interstate transportation of fraudulently converted property of the United States government.

AFFIRMED.

EDMONDSON, Circuit Judge, dissents.

BIRCH, Circuit Judge, dissenting:

I respectfully dissent. All law students are cautioned about this kind of case in their first semester of law school—one in which hard facts make bad law. The majority of our court today establishes a precedent that places in jeopardy of criminal prosecution recipients who cash or deposit mistakenly issued government checks—even where the payee did nothing to cause or induce the mistake. This Orwellian result is reached through judicial interpretation of 18 U.S.C. § 641 (1988), which is an important issue of first impression.[1]

---

1. While there are any number of cases in which government checks are stolen or otherwise misappropriated, or where government funds designated for particular purposes are misused, there appears to be no case of a government check being cashed by the named payee serving as grounds for a prosecution under section 641. *See, e.g., Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (the government property was spent bomb casings on a military bombing range); *United States v. Hope,*

901 F.2d 1013 (11th Cir.1990) (treasury checks were funds for use in community development projects payable to an organization), *cert. denied,* 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991); *United States v. Richardson,* 755 F.2d 685 (8th Cir.1985) (dealt with a purloined treasury check); *United States v. Spear,* 734 F.2d 1 (8th Cir.1984) (social security checks for defendants' deceased mother converted by children after direct deposit); *United States v. Santiago,*

Pursuant to this judicial rule a government check payable to a named individual and delivered to that payee, typically by mail, is deemed to be "government property." It is government property, however, only if Big Brother's computer or a negligent bureaucrat makes a mistake—otherwise, the named payee/recipient may, without fear of prosecution, cash it. Thus, all recipients of government checks, particularly those who hold unpopular posts such as members of Congress, judges, appointed criminal defense lawyers, and IRS employees, should be admonished to scrutinize very carefully each treasury check that they receive. If all or any part of the payment made by that check is a "mistake" or "error," then that recipient is subject to prosecution under 18 U.S.C. § 641 for conversion of government property. This threat also faces the more typical recipients, including social security claimants, veterans, and federal service retirees. The majority opinion clearly states that "this case involves a situation where a recipient receives an erroneously issued check representing funds that the government never intended for the recipient." Majority Op. at 981. Further, the majority unequivocally "hold[s] that the government at all times retained a property interest in the proceeds of the *erroneously* issued United States Treasury check." *Id.* at 981 (emphasis in original).

The majority appears unconcerned that potentially thousands of government check recipients will be in danger of to prosecution

729 F.2d 38 (1st Cir.1984) (involved stolen social security benefits checks); *United States v. Carr*, 706 F.2d 1108 (11th Cir.1983) (the "government property" at issue was stolen savings bonds); *United States v. O'Kelley*, 701 F.2d 758 (8th Cir.) (focused upon stolen social security benefits checks), *cert. denied*, 464 U.S. 838, 104 S.Ct. 128, 78 L.Ed.2d 124 (1983); *United States v. McIntosh*, 655 F.2d 80 (5th Cir.1981) (grant transferred to closing attorney by Farmer's Home Administration to satisfy grantee's debts), *cert. denied*, 455 U.S. 948, 102 S.Ct. 1450, 71 L.Ed.2d 662 (1982); *United States v. Forcellati*, 610 F.2d 25 (1st Cir.1979) (involved a stolen treasury check), *cert. denied*, 445 U.S. 944, 100 S.Ct. 1342, 63 L.Ed.2d 778 (1980); and *United States v. Rowen*, 594 F.2d 98 (5th Cir.) (government funds transferred to a college but embezzled by an employee), *cert. denied*, 444 U.S. 834, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979).

because of computer or bureaucratic errors, the number of which we also intuitively know to be in the thousands. The majority's response to that state of affairs is to observe that "the scope of prosecutions under section 641 strikes an appropriate balance between protection of government property and avoidance of punishing innocent conversions." *Id.* at 982. Thus, the majority apparently countenances the sacrifice of the innocent converter [2] on the altar of government property protection—all because some machine or civil servant erred. But the majority consoles us [3] with the observation that the person receiving and cashing the check will have the right to a trial and that "the government must still prove beyond a reasonable doubt that the [recipients] acted 'knowingly and willfully with the intent to either temporarily or permanently deprive the government of its property.'" *Id.* at 982 (quoting *United States v. Lanier*, 920 F.2d 887, 895 n. 62 (11th Cir.1991)). The "knowingly" referenced by the majority has nothing to do with knowledge of the error having occurred or the amount thereof. As presented in the majority's opinion, the knowledge to be proved relates to the use of the government property; that is, the portion of an erroneous payment over and above the amount properly due to the recipient of the treasury check. The majority cites *United States v. Lanier*, 920 F.2d 887 (11th Cir.1991) for this proposition. That decision by our court plainly states: "In this circuit, *to establish the requi-*

**2.** "Conversion" is defined as "[a]n unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of the owner's rights. Any unauthorized act which deprives an owner of his property permanently or for an indefinite time. Unauthorized and wrongful exercise of dominion and control over another's personal property, to exclusion of or inconsistent with rights of owner." Black's Law Dictionary 332 (6th Ed.1991).

**3.** I say "us" because I, like my judicial colleagues, also receive periodic treasury checks, both for salary and for travel and lodging reimbursement. It is rare, even with a pay check, that the total remains constant from month to month. Changes in deductions of all sorts (medical, FICA, pension, savings plan, credit union, etc.) occur regularly. Each change presents an opportunity for error.

*site criminal intent,* the government need only prove that *defendants knowingly used* government property for their own purposes in a manner that deprived the government of the use of the property." *Id.* at 895 (emphasis added). When the recipient of a government check deposits or cashes the check, he has intentionally and knowingly used the property for his own purposes. Little comfort springs from the burden of proof to which the majority alludes.

Accordingly, under the majority's construction of this statute, a typical government worker or benefits recipient is subject to successful prosecution when the government check she receives is in error and she receives even a little bit too much—not so much as to red flag the overpayment, but certainly an amount different from that received in previous checks—where the recipient knowingly uses that overpayment "for [her] own purposes in a manner that deprived the government of the use of the property"; that is, she cashed the check. *Id.* at 895.

Obviously the restraint in this entire scheme is the assumption that federal prosecutors will act fairly and not seek to prosecute such a recipient who has no knowledge that an error has been made in the amount of payment that he has received and used; that is, cashed or deposited. While such confidence generally would not be misplaced, the specter raised by the result in this case is ominous. Americans ought not have to depend on the kindness and good sense of prosecutors when conducting daily affairs. Fear of the power to be unfairly prosecuted is chilling and need not be justified here; history has done that repeatedly. Common sense tells us that this result and, hence, this statutory construction should be rejected.

This case is not about whether Hale and McRee can lawfully keep the money paid to them by mistake. They cannot. The government is not without clear statutory authority to recapture funds erroneously paid to recipients. Under 26 U.S.C. § 7405 the government could have pursued Hale and McRee to recover the erroneously issued refund. Moreover, Hale and McRee were arguably criminally prosecutable under 18 U.S.C. § 2232 for attempting to conceal the proceeds of the erroneously issued check. The majority interprets section 641 principally upon a declaration of policy that seeks to close statutory gaps. In actuality, the majority uses section 641 duplicitously to serve the functions already performed by sections 2232 and 7405. However, where construction of a criminal statute is involved, the Supreme Court has cautioned:

> Even were the statutory language ... ambiguous, longstanding principles of lenity, which demand resolution of ambiguities in criminal statutes in favor of the defendant, *Simpson v. United States,* 435 U.S. 6, 14–15, 98 S.Ct. 909, 913–914, 55 L.Ed.2d 70 (1978) (applying rule of lenity to federal statute that would enhance penalty), preclude our resolution of the ambiguity against petitioner on the basis of general declarations of policy in the statute and legislative history. *See Crandon v. United States,* 494 U.S. [152], [160], 110 S.Ct. 997, 1002, 108 L.Ed.2d 132 (1990) ("Because construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text").

*Hughey v. United States,* 495 U.S. 411, 422, 110 S.Ct. 1979, 1985, 109 L.Ed.2d 408 (1990). In the instant case the venerable rule of lenity has been disregarded.

While 18 U.S.C. § 641 may be construed in appropriate situations "to avoid gaps and loopholes between offenses," Majority Op. at 11, the construction placed upon this statute by the majority unnecessarily exposes a multitude of innocent government check recipients to the risk of criminal prosecution (including the expense, embarrassment, unwanted publicity and its attendant hardships that accompany even acquittals). This statutory construction establishes a precedent that defies common sense and violates the well-established rule of lenity.

For these reasons I am unable to join in this judgment or the analysis used to support it.