**UNITED STATES of America, Plaintiff,**

v.

**Joseph HARANDA, Defendant.**

No. 03–20063–BC.

United States District Court, E.D. Michigan, Northern Division.

Aug. 26, 2004.

Janet L. Parker, U.S. Attorney's Office, Bay City, MI, for Plaintiff.

Kenneth R. Sasse, Federal Defender Office, Flint, MI, for Defendant.

*OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL*

LAWSON, District Judge.

The defendant was charged in a single count indictment with embezzling, stealing,

purloining, or knowingly converting to his own use a United States Treasury Department check in violation of 18 U.S.C. § 641. The case proceeded to a trial before a jury in March 2004. The defendant moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 at the conclusion of the government's proofs, and the Court reserved its decision on the motion, ultimately denying it. The defendant then proceeded with his case, after which the jury returned a verdict of guilty on March 24, 2004. The defendant has filed a timely motion for judgment of acquittal and supporting brief, to which the government has responded. A hearing on the motion was held in open court on August 17, 2004. The Court now concludes that sufficient evidence was presented by the government from which a rational jury could have found beyond a reasonable doubt each of the elements of the offense. The Court, therefore, will deny the defendant's motion for judgment of acquittal.

## I.

The dispute in this case centers on an income tax refund that the defendant was owed on his 2000 tax return. The Treasury Department in fact mailed a check to the defendant in the amount of the refund, $4,131, payable to the defendant in his own name. However, when the check was sent, the defendant was not at his residence, where he had lived with Sharlene Brockett, f/k/a Sharlene Milliman. It is undisputed that Brockett signed the defendant's name to the check and deposited it into her bank account on October 11, 2001. Catherine Reder, an attorney who had represented Ms. Brockett in a child custody and support proceeding involving the defendant, testified that she heard the defendant admit during the court proceeding that he gave permission to Brockett to endorse his name on the check. The defendant disputed Reder's claim at trial, but it is clear that the defendant demanded return of the check proceeds and other items of personal property during the friend of the court hearing on November 7, 2001. The defendant contended that Brockett took his pickup truck and all his worldly possessions during a time when the defendant was in jail, and he wanted compensation for his loss.

Approximately a week after the court hearing, the defendant contacted a Michigan State Police officer, Trooper Michael Darrow, to report that his federal income tax refund check has been stolen by Brockett. Darrow began an investigation that initially focused on Brockett as a suspect. In the mean time, on November 20, 2001 the defendant signed and submitted a claim to the United States Treasury Department for the proceeds of his income tax refund check. The parties agree that as of the date the defendant submitted the claim, he had not received payment of his 2000 income tax refund. However, the claim form contained a warning notice on its first page that stated: "This claim is made for the proceeds of the above check. If you cash both the original and any settlement checks, the overpayment must be promptly refunded."

Trooper Darrow testified that he contacted Brockett on November 26, 2001. Brockett told Darrow that she had kept the proceeds of the check in a bank account, and after the friend of the court hearing she obtained a cashier's check payable to herself in the same amount as the defendant's refund. Brockett stated to Darrow that she was willing and able to return the money from the tax refund check to the defendant. The next day, November, 27, 2001, Brockett obtained a cashier's check made payable to the defendant in the same amount as the cashier's check to herself that she had shown to Trooper Darrow. The new check, in the

amount of $4,131, was sent to the defendant by Brockett's attorney, Catherine Reder.

Darrow then attempted to conduct a follow-up interview with the defendant. He called the defendant on November 30, 2001 and arranged for an interview with him on the following day. The defendant failed to appear at the scheduled time. On December 10, 2001, the defendant received a certified letter from Ms. Reder containing the bank check for $4,131 accompanied by a letter stating that the check represented the amount of his federal income tax refund check. The defendant signed the return receipt for the letter and check, although he disputes that he received the letter. He then cashed the check, depositing some of the money into his own account, and keeping the remainder as cash. The Treasury Department initially refused payment of the check that Brockett had deposited in her account; however, the depository bank eventually was reimbursed for the amount sometime after August 23, 2002.

On May 1, 2002, the United States Treasury issued a check to the defendant in the amount of $4,131, and the defendant promptly deposited this check and used the proceeds. The government contended that cashing the second refund check constituted conversion of government property, since the defendant previously had recovered the amount of the tax refund from Brockett. He therefore received a total of $8,262 for his tax refund when he was entitled to only $4,131. However, at trial the defendant argued that the money he received from Brockett represented compensation for his pickup truck and other items of personal property she had taken from him.

After the defendant had cashed the second treasury check, he was contacted and interviewed by Richard Kelly from the Office of the Treasury Inspector General for Tax Administration. At the time he did not mention his stolen truck or personal property. Kelly interviewed the defendant again in December 2002. The defendant admitted during the interview that he had received and kept the proceeds from both the cashier's check from Brockett and the replacement check from the IRS. He claimed at that time that he thought the check he had received from Brockett was an equity payment from the sale of his truck. He did not mention the personal property that was to have disappeared with the truck.

After a two-day trial, the jury convicted the defendant as charged. In his motion for judgment of acquittal now pending before the Court, he contends that the evidence at trial failed to establish that the defendant converted property of the government because he obtained and cashed a legitimately claimed refund check. He states that his claim for a replacement check was valid because he had not received his income tax refund at the time. He also insists that because he was entitled to his income tax refund, the replacement check did not belong to the government at the time it was issued.

## II.

A motion for judgment of acquittal pursuant to Rule 29 requires the Court to apply the well-known standard articulated by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The critical inquiry is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Id.* at 318, 99 S.Ct. 2781.

[T]his inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead,

the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier, of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Id.* at 318–19, 99 S.Ct. 2781 (internal citation and footnote omitted).

 The evidence need not exclude every theory of innocence. *Id.* at 319. The testimony of a single witness is generally sufficient to demonstrate guilt beyond a reasonable doubt. "The prosecution, however, must present substantial evidence as to each element of the offense from which a jury could find the accused guilty beyond a reasonable doubt." *Brown v. Davis,* 752 F.2d 1142, 1145 (6th Cir.1985) (internal citation omitted). "Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept to support a conclusion. It is evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred." *United States v. Martin,* 375 F.2d 956, 957 (6th Cir.1967). Where the evidence is at least as indicative of innocence as guilt, the Court must direct a verdict of acquittal. *United States v. Berger,* 224 F.3d 107, 116 (2d Cir.2000).

The statute under which the defendant was charged states:

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—Shall be fined under this

title or imprisoned not more than ten years, or both.

18 U.S.C. § 641. In order to convict a defendant under this statute, the government must prove beyond a reasonable doubt that the "defendant (1) knowingly (2) stole or converted to [his use or] the use of another (3) something of value of the United States." *United States v. Forman,* 180 F.3d 766, 769(6th Cir.1999) (citing *United States v. Sanderson,* 966 F.2d 184, 188 (6th Cir.1992)).

The defendant contends that the government's proofs are insufficient on the third element because the second treasury check he cashed was not property of the United States. He argues that he properly applied for and received the substitute check, he was owed the refund on taxes, the check was made payable to him, and he properly cashed it. The defendant also points out that at the time he cashed the second check, the Treasury had not actually paid the depository bank in which Brockett had deposited the first treasury check, so the money obtained by the defendant on the second instrument rightfully belonged to him, not the United States Treasury.

The question of whether a Treasury check and the funds it represents remains "a thing of value of the United States" after the instrument has left the possession of the government has been considered by other Circuits in the context of a variety of factual scenarios. In *United States v. Forcellati,* 610 F.2d 25, 31 (1st Cir.1979), the court held that a Treasury check the defendant stole before it was received by the named payee remained the property of the United States. The court reasoned that "[a] check significantly remains the check of the drawer, for that is what gives it its value in the hands of the payee or in the hands of any third party who gets it and forges the payee's name on

the back well enough to negotiate the check." *Ibid.* Moreover, the check is a written instrument that has intrinsic value of proof of payment. "For these instrumental and record-keeping purposes the check as a piece of paper never genuinely ceases to be the property of the issuer." *Ibid.*

The Sixth Circuit reached a similar conclusion and affirmed a conviction under a predecessor statute in *Clark v. United States,* 268 F. 329 (6th Cir.1920). The defendant in that case took a check from a postal paymaster that was payable to another postal worker. The court noted that the true measure of the value of the instrument was not its intrinsic value but rather that of the funds it represented. Nonetheless, the court held that the check remained the property of the United States at the time the defendant took it.

The concept was expanded in *United States v. O'Kelley,* 701 F.2d 758 (8th Cir. 1983), where the court held that a Treasury check that had been delivered to its intended payee and then later stolen by the defendant from that payee remained government property. The court determined "that the unendorsed check continued to be a 'thing of value of the United States' even after receipt of the check by" the named payee. *Id.* at 760.

In this case, Haranda points out that he did not steal the Treasury check he cashed; it was made payable to him. However, two courts have held that government checks issued to payees who cashed them remained government funds and could support a conviction under 18 U.S.C. § 641 if the respective defendants were not entitled to the funds at the time they negotiated the checks. In the first such case, *United States v. McRee,* 7 F.3d 976 (11th Cir.1993) (en banc), the Treasury Department issued a check of nearly $360,000 to the defendant because of a computer error in which a jeopardy assessment collection was misinterpreted as an overpayment. The court, in a split decision, held that the defendant's act of negotiating the check, to which he knew he was not entitled, constituted an act of conversion under Section 641, and that the check and the funds remained government property. The dissent, which Haranda urges this Court to follow, would have held that "a government check payable to a named individual and delivered to that payee, typically by mail" does not constitute government property, even when the check mistakenly was issued and "the payee did nothing to cause or induce the mistake." *Id.* at 983–84. The dissenting judge was concerned that "the construction placed upon this statute by the majority unnecessarily exposes a multitude of innocent government check recipients to the risk of criminal prosecution." *Id.* at 985. However, *McRee* was followed by the Eighth Circuit in *United States v. Irvin,* 67 F.3d 670 (8th Cir.1995), in which the court held that the mistaken issuance of a large refund check did not change the Treasury's ownership of the overpayment. There, the defendant stated that "he had gone to a lonely road and prayed that he would become self sufficient and be able to take care of others," *id.* at 671, and when the check in the amount of $836,939.19 came to him in the mail, he believed it was in answer to his prayers, so he cashed it. The court affirmed his conviction for converting government funds contrary to Section 641.

Haranda argues that *McRee* and *Irvin* are distinguishable because the check in this case was not issued to him by mistake. Rather, it represented a tax refund to which he actually was entitled. He says that he came into possession of the check in a valid and lawful manner. He reasons, therefore, that the check was not the prop-

erty of the government at the time he cashed it.

■ The Court cannot accept that argument, however, in light of the authority cited above that establishes the rule that the United States retains a property interest in a government-issued check and the funds in the treasury it represents until the check is negotiated. It stands to reason, therefore, that if a government check is negotiated by a person who does not have a right to the funds, a violation of Section 641 may result, provided the person acts with criminal intent.

Moreover, if the check in this case and the proceeds it represented were not the property of the government, they must have belonged to someone else, leaving the defendant as the only other possible "owner" of the check and the funds. However, the defendant does not seriously contend that he was entitled to be paid twice for his income tax refund. If the defendant already had received payment of his refund, he was not entitled to cash the second Treasury check he received in May 2002.

Section 641 is broad enough to punish the misuse or abuse of government property, provided that the defendant acts with criminal intent. In *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), the Supreme Court held that Congress' purpose in codifying this section was to consolidate the variety of common-law theft offenses and criminalize the misappropriation of government property in all of its criminal manifestations. The Court explained:

> It is not surprising if there is considerable overlapping in the embezzlement, stealing, purloining and knowing conversion grouped in this statute. What has concerned codifiers of the larceny-type offense is that gaps or crevices have separated particular crimes of this general class and guilty men have escaped through the breaches.... Conversion ... may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful. Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use.... Knowing conversion adds significantly to the range of protection of government property without interpreting it to punish unwitting conversions.

*Id.* at 271–72, 72 S.Ct. 240.

There was evidence introduced at trial in this case from which the jury could have concluded that the defendant authorized Sharlene Brockett to endorse and deposit the first Treasury check that was issued to the defendant as his income tax refund. If he indeed authorized Brockett to cash his tax refund check, Haranda's claim for a tax refund from the government would have been extinguished, and he would have had no right even to apply for a replacement check. Moreover, the jury also could have found from the evidence that when Haranda received the cashier's check from Brockett in the exact amount of his income tax refund, he was made whole on his claim against the government for an income tax refund, and that his subsequent receipt and cashing of the second Treasury check constituted a knowing conversion of government property. Cashing a check to which one is not entitled is an act of conversion. Doing so knowing one is not entitled to the funds with intent to keep the money is a crime; and when the funds belong to the government Section 641 is violated.

### III.

The Court concludes that the government presented sufficient evidence at trial

to allow the jury to find all of the essential elements of the crime charged in the indictment beyond a reasonable doubt.

Accordingly, it is **ORDERED** that the defendant's motion for judgment of acquittal is **DENIED**.

It is further **ORDERED** that the parties appear before the Court for sentencing on **September 23, 2004 at 10:00 a.m.**